Filed 10/17/13

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DALE M. WALLIS, | C066545 |
| Plaintiff and Appellant, | (Super. Ct. No. CV06072352) |
| v. | |
| PHL ASSOCIATES, INC. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, David De Alba, Judge.  Affirmed in part and reversed in part.

Murphy, Campbell, Guthrie & Alliston, Murphy, Campbell, Alliston & Quinn, George E. Murphy, Suzanne M. Nicholson, J. Douglas Durham; Law Office of Joel. C. Baiocchi and Joel Christopher Baiocchi for Plaintiff and Appellant.

Downey Brand, Tory E. Griffin; and Klaus J. Kolb for Defendants and Appellants.

---

* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I, II, IV, V and VI.

1

Plaintiff Dale M. Wallis invented an antigen for a bovine mastitis vaccine as part of her duties as an employee of defendant PHL Associates, Inc. (PHL), more than 20 years ago. The vaccine was eventually sold to Upjohn, and this protracted litigation has featured the contest between Wallis and PHL over the benefits related to that sale. A jury concluded that PHL and Wallis agreed that Wallis would own the antigen, but the jury also concluded that PHL committed no fraud relating to the antigen. Instead, the jury concluded PHL committed fraud relating to Wallis's money -- $20,000 she paid to PHL and its shareholders (also defendants) to buy stock in PHL. Based on this conclusion, the jury awarded Wallis a total of more than $2 million dollars in compensatory damages and $500,000 in punitive damages. Finding unjust enrichment, the trial court awarded Wallis a constructive trust against PHL of more than $1 million. Both sides appeal.

We conclude that (1) the jury's verdict that PHL (and the individual defendant shareholders) committed fraud related to Wallis's money does not support the damages award of more than $2 million; (2) given the required reduction of the fraud damages, the punitive damages award against PHL must also be reduced; (3) the trial court's equitable award must be reversed and remanded for a new trial because the court improperly denied PHL's request for a statement of decision; (4) the trial court erred by offsetting the award of damages to Wallis before computing prejudgment interest; and (5) we need not resolve several additional issues raised by the parties because of how we resolve the issues already mentioned.

We therefore modify the judgment as to the jury verdict and remand for recalculation of prejudgment interest, and we reverse and remand the judgment as to the equitable relief.

FACTS

Defendant PHL develops, produces, and markets animal biologics (commercial biotechnology products). Individual defendants Jeffrey Wichmann, Mary Holmes, and

2

Thomas Hanzo were shareholders and directors of PHL.  Before 1989, Holmes held 20 percent of the stock, and Wichmann and Hanzo each held 40 percent.

PHL hired plaintiff Wallis in October 1988.  Wallis served as PHL's director of laboratories.

In the fall of 1988, Wallis developed the J-5 TC antigen (referred to hereafter as the antigen) for a vaccine for bovine mastitis.  In a vaccine, the antigen is the active ingredient that invokes the immune response.  It was disputed at trial whether Wallis developed the antigen on her own time or within the scope of her PHL employment.  As we discuss later, the jury concluded that she developed the antigen within the scope of her PHL employment.

In May 1989, Wallis and PHL negotiated terms of a long-term employment contract, including a term that any inventions or products she developed would remain her own.  However, the agreement was never finalized.

In June 1989, Wallis met with the PHL board of directors to discuss the production of a vaccine using the antigen.  The board expressed a desire to do so, but Wallis felt the board was reneging on its promise to make her a shareholder.  She told PHL's attorney, Thomas Strohl, that she was considering taking the antigen to another company.

PHL gave Wallis a raise and the opportunity to purchase 20 shares of PHL stock for $1,000 per share.  Purchase of the shares would entitle Wallis to a position on the board of directors.  Wallis paid $15,000 to PHL for 15 shares in July 1989 and paid the individual defendants a total of $5,000 for five shares in December 1989 ($1,000 to Holmes and $2,000 each to Wichmann and Hanzo).  After she paid for the PHL shares, she was given a vote in board meetings.

PHL began using the antigen to manufacture vaccine for the market.  Wallis received shareholder bonuses through 1990 and part of 1991.

3

In 1991, PHL negotiated with Upjohn to sell the vaccine. During the negotiations with Upjohn, PHL fired Wallis. She refused an offer from Wichmann and Holmes to buy back her shares because she believed she was entitled to one-sixth of the Upjohn deal. Wichmann, Hanzo, and Holmes voted to remove Wallis from the board of directors.

In January 1992, PHL finalized the sale of the vaccine to Upjohn for $2.5 million. PHL agreed not to compete with Upjohn for 10 years, and Upjohn agreed that PHL would be the exclusive producer and supplier of the antigen in the United States.

In March 1992, PHL attorney Vigfus Asmundson sent Wallis a letter notifying her that she was not a shareholder because she had purchased only an option to become a shareholder after five years of employment. Strohl enclosed checks to refund the purchase price of the shares plus interest. Wallis rejected the characterization of the transaction and refused to cash the checks.

Meanwhile, Wallis's husband at the time, James Wallis, started an animal biologics company, Hygieia Biological Laboratories (Hygieia), in February 1991. After Wallis left PHL, she became an unpaid consultant for Hygieia. In 1993, she was put on the Hygieia payroll. Hygieia developed and marketed its own J-5 antigen, and Wallis contacted Upjohn trying to get Upjohn to purchase the vaccine from Hygieia.

In 1993, Upjohn sued Wallis and Hygieia in federal court, alleging that they were infringing on the vaccine Upjohn had purchased from PHL. Wallis and Hygieia filed a counterclaim. The court granted summary judgment to Upjohn on the counterclaim, and the parties settled Upjohn's claim with Wallis agreeing that Upjohn owned the rights to the vaccine.

PROCEDURE

Wallis filed a complaint against PHL, Wichmann, Hanzo, and Holmes on June 22, 1994.[1]  The complaint alleged causes of action for unjust enrichment, fraud, conspiracy, constructive fraud, constructive trust, and conversion.  Wallis alleged but later dismissed a spoliation of evidence cause of action.  Wallis did not allege a breach of contract cause of action.  The complaint also named attorney Strohl as a defendant, but he is not a party to this appeal.

PHL filed a cross-complaint against Wallis, James Wallis, and Hygieia on February 11, 1999.  The cross-complaint alleged causes of action for declaratory relief, rescission, intentional interference with contractual advantage, fraud, misappropriation of trade secrets, conversion, breach of fiduciary duty, unfair competition, and conspiracy.

Wallis moved to bifurcate trial on the complaint and cross-complaint and to stay discovery on the cross-complaint until after trial on the complaint.  The trial court granted the motion, and trial on the complaint began with Judge Stephen L. Mock presiding.

After Wallis's case-in-chief, the trial court granted motions for nonsuit on the constructive fraud cause of action as to all defendants and the conversion cause of action as to the individual defendants.

The jury returned special verdicts on June 13, 2000, as follows:

*General Allegations*

- Wallis invented the J-5 TC antigen.
- She developed the antigen as part of her duties as an employee of PHL.
- Wallis and PHL agreed that she would own the antigen.

---

**1**     Hereafter, we refer to defendants collectively as "PHL," except where further specification is necessary.

*Fraud Relating to the Antigen*

- Neither PHL nor any of the individual defendants made a false promise or false representation to Wallis related to the *antigen*.

*Fraud Relating to Wallis's Money*

- PHL did not make a false promise to Wallis related to her *money*.

- The individual defendants made a false promise to Wallis related to her *money* and did not intend to perform on the promise.

- PHL and the individual defendants knowingly made a false representation to Wallis related to her *money* for the purpose of inducing Wallis to justifiably rely on it, which she did, unaware that the representation was false and that PHL and the individual defendants did not intend to perform on it.

- Wallis's fraud cause of action was not barred by unclean hands.

- Wallis did not fail to mitigate her damages caused by fraud.

- Wallis's damages for fraud were $1,944,997 against PHL, $259,330 against Wichmann, $259,330 against Hanzo, and $129,665 against Holmes.

*Conversion of the Antigen*

- PHL did not deliberately interfere with the *antigen*.

*Conversion of Wallis's Money*

- PHL deliberately and unjustifiably interfered with Wallis's $15,000, but did not interfere with Wallis's $5,000.

- PHL did not make a good faith offer to return $20,000 to Wallis.

- Wallis's conversion claim against PHL was barred by neither the statute of limitations nor unclean hands.

- Wallis's total damages suffered as a result of PHL's conversion of her money was $1,944,997.

- The individual defendants deliberately and unjustifiably interfered with Wallis's $5,000 but did not interfere with Wallis's $15,000.

- The individual defendants did not make a good faith offer to return $5,000 to Wallis.

- Wallis's conversion claim against the individual defendants was barred by neither the statute of limitations nor unclean hands.

- Wallis's total damages suffered as a result of the individual defendants' conversion of her money was $259,330 against Wichmann, $259,330 against Hanzo, and $129,665 against Holmes.

*Punitive Damages*

- PHL and the individual defendants committed fraud, but not with malice or oppression.

- The jury did not assess punitive damages against the individual defendants.

- The jury assessed $500,000 in punitive damages against PHL.

- The jury did not include in their assessment of compensatory damages for fraud and conversion any damages intended for the sake of example or for the purpose of punishment.

In summary, the jury found PHL liable for fraud and conversion related to Wallis's money and assessed $1,944,997 in compensatory damages and $500,000 in punitive damages, and the jury also found the individual defendants liable for fraud and conversion related to her money and assessed compensatory damages only: $259,330 against Wichmann, $259,330 against Hanzo, and $129,665 against Holmes. The jury did not find PHL and the individual defendants liable for fraud related to the antigen.

After the jury trial was completed, Judge Mock heard argument on the equitable causes of action. The court granted the individual defendants' motion for nonsuit on the unjust enrichment and constructive trust causes of action as it relates to the antigen, but it denied PHL's similar motion for nonsuit. With respect to unjust enrichment related to

7

Wallis's money, the trial court denied the motions for nonsuit of both PHL and the individual defendants (although the trial court later determined that Wallis had an adequate remedy at law as to the money).

On September 26, 2000, the court ruled on the equitable causes of action. It stated that it was bound by the factual determinations of the jury. Concerning the merits, the court stated there was no oral or written contract providing Wallis with compensation for the antigen. However, it would be unfair to Wallis to allow PHL to retain the money it received for the antigen. Based on this reasoning, the court found there was unjust enrichment and that the appropriate equitable remedy was a constructive trust.

Concerning whether PHL wrongfully acquired the antigen from Wallis, the court stated: "There's no question that the Defendants acquired the antigen. Without the antigen there could be no vaccine[. N]othing would have been sold to Upjohn. [¶] Now, the Defendants argue that when the jury found that there was no fraud and no conversion with regard to the antigen, then the Court is precluded from imposing constructive trust. [¶] I acknowledge the jury's finding under Civil Code Section 2224, constructive trust can be imposed when there's any kind of wrongful taking whether it's by accident, mistake, undue influence, the violation of a trust or any other wrongful act. [¶] In this case there's no question that PHL took the antigen without any compensation due to the Plaintiff. I find that at the time the Defendants took the antigen and failed to pay the Plaintiff they were operating under what I would call a mistake of fact."

Based on this reasoning, the court imposed a constructive trust of $671,262 against PHL for royalties PHL received for the antigen after it was sold to Upjohn up to May 2000. It also imposed a constructive trust of $562,500 against PHL for the noncompetition agreement between PHL and Upjohn. As to this amount attributable to the noncompetition agreement, however, the trial court was not prepared to calculate interest. As to the $20,000 Wallis paid for the shares in PHL, the court stated that she had an adequate remedy at law. Finally, the court stated that it was unprepared to rule on

8

the issues of whether to require an accounting or appoint a receiver. It therefore took that issue under submission, as well as the issue of interest on the amount attributable to the noncompetition agreement.

At the end of the hearing on September 26, 2000, and in response to a question from counsel for PHL, the court stated that it did not intend its ruling to be final until it had made a decision on the issue of interest.

On November 16, 2000, the court held another hearing on its equitable decision. It stated that on the issue of prejudgment interest for the constructive trust for the noncompetition agreement it would award $189,273.71, making the total equitable judgment $1,423,035.71. The court then discussed with counsel for the parties whether to appoint a receiver. Unsure how to proceed, the court asked the parties to file letter briefs on the issue.

On December 28, 2000, the court held a hearing to address two remaining issues: whether a receiver could be appointed and, if so, whether the court should appoint one then. The court stated that the requirements for appointment of a receiver were met in this case, but that a receiver would not be appointed, with the understanding that other steps would be taken to preserve assets available to satisfy the judgment.

The court lifted the stay on the cross-complaint proceedings. Because the cross-complaint was still pending, the court did not enter judgment.

On January 5, 2001, PHL filed a written request for statement of decision on the equitable issues tried to the court. The court, however, denied the request as untimely.

In July 2002, Wallis filed a notice of peremptory disqualification of Judge Mock under Code of Civil Procedure section 170.6, and Judge Mock stepped aside.

Hanzo passed away in 2004, and his estate settled with Wallis. For that reason, neither Hanzo nor his estate's representative is a party to this appeal.

In April 2008, the case was assigned to Judge David De Alba of the Sacramento County Superior Court.

9

In April 2010, the parties settled the cross-complaint, with Wallis paying PHL $1,827,000. PHL dismissed the cross-complaint on July 6, 2010.

With the cross-complaint dismissed, the parties filed briefs concerning the judgment to be entered on the 10-year-old jury verdicts and equitable decisions on the complaint. Wallis stated that the damage awards against PHL for fraud and conversion were duplicative and elected to recover on the fraud cause of action. Wallis also stated that $562,500 of the equitable award attributable to the noncompetition agreement between Upjohn and PHL duplicated another part of the award.

On July 10, 2010, 16 years after filing of the complaint and 10 years after trial, Judge De Alba entered judgment. As later amended, the judgment against PHL was $1,944,997 on the jury's fraud verdict, $500,000 on the jury's punitive damages verdict, and $671,262 on the equitable claims. The court also awarded prejudgment interest on $789,259 (the amount of the compensatory damages award in Wallis's favor minus the amount of the settlement on PHL's cross-complaint) at a rate of seven percent from the date of the verdict. The judgment against Wichmann was "$259,330 for fraud and deceit together with prejudgment interest from the date of the verdict for a total of $443,049." And the judgment against Holmes was "$129,665 together with prejudgment interest from the date of the verdict for a total of $221,525."

PHL and Wallis filed postjudgment motions. PHL filed motions for new trial, for judgment notwithstanding the verdict, and to set aside the judgment, while Wallis filed a motion for new trial. Judge De Alba expressed concern that he did not have jurisdiction to entertain the postjudgment motions because he was not the trial judge, but the parties stated that they had no objection to his ruling on the motions. The court took the matters under submission and later issued a ruling denying all postjudgment motions.

10

DISCUSSION

I

*Inconsistent Special Verdict*

PHL contends that the special verdict does not support the damages award of more than $1.9 million because, according to the jury, PHL committed fraud related to Wallis's *money* but not related to the *antigen*. PHL argues that, instead, the maximum damages for fraud related to Wallis's money equaled the $15,000 she paid to PHL for shares in the corporation. Wallis responds that the $1.9 million damages award is supported because PHL's false representations about the money were the means by which PHL obtained access to the antigen. We conclude that the proper measure of damages for fraud is out-of-pocket damages (as the jury was properly instructed), and that measure supports no more than $15,000 in damages for PHL's fraud related to Wallis's money.

Before reviewing the law concerning special verdicts, we note that our discussion relates to PHL's fraud and the damages awarded against PHL. At the end of the discussion, we comment on how the discussion as to the damages also relates to the damages awarded against the individual defendants.

"A special verdict is inconsistent if there is no possibility of reconciling its findings with each other. [Citation.] If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency. [Citations.] If no party requests clarification or an inconsistency remains after the jury returns, the trial court must interpret the verdict in light of the jury instructions and the evidence and attempt to resolve any inconsistency. [Citations.]

"On appeal, we review a special verdict de novo to determine whether its findings are inconsistent. [Citation.] With a special verdict, unlike a general verdict or a general verdict with special findings, a reviewing court will not infer findings to support the

11

verdict. [Citations.] ' " 'Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error.' " [Citations.]' [Citation.] 'The appellate court is not permitted to choose between inconsistent answers. [Citations.]' [Citation.] The proper remedy for an inconsistent special verdict is a new trial. [Citation.]" (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357-358, fn. omitted.)

Although the jury found PHL liable under both fraud and conversion theories, Wallis elected the remedies for fraud. Therefore, we need not discuss the jury's findings as to conversion. We also note that, because Wallis did not allege breach of contract, the jury was not asked questions relating to breach of contract and was not given the option of awarding contract damages.

The pertinent parts of the special verdicts we must try to harmonize with respect to fraud are as follows (the findings were the same as to the individual defendants, except as noted):

- Wallis invented the J-5 TC antigen as part of her duties as an employee of PHL.

- PHL and Wallis agreed Wallis owned the J-5 TC antigen.

- PHL *did not* make a false promise to Wallis or a false representation of material fact related to the J-5 TC antigen.

- PHL *did not* make a false promise to Wallis as to a material matter related to Wallis's money. (However, the jury concluded that Wichmann, Hanzo, and Holmes made a false promise to Wallis as to a matter related to her money.)

- PHL knowingly made a false representation of material fact related to Wallis's *money*, with the purpose of inducing Wallis to rely on the misrepresentation, and Wallis, unaware that the representation was false, actually and justifiably relied on it.

- Wallis's damages from PHL's fraud totaled $1,944,997 (Wichmann -- $259,330; Hanzo -- $259,330; Holmes -- $129,665).

12

Therefore, the jury unequivocally found that PHL committed the elements of a fraud cause of action relating to Wallis's money but not related to the antigen and that damages resulting from PHL's fraud totaled more than $1.9 million. The question is whether the fraud findings support the amount of damages when viewed in light of the pleadings, jury instructions, and evidence. We conclude that they do not.

Wallis alleged in her complaint that PHL defrauded her into giving up "all rights, benefits and profits due her as the owner of the J-5 TC vaccine as well as the money paid to defendants to purchase said shares." She continued: "Plaintiff was justified in relying upon those representations, especially in that she had paid $20,000 for 20 shares to PHL [referring to the total amount paid to all defendants] . . . , having been allowed to purchase those shares as partial compensation in return for PHL's use of her J-5 TC vaccine."

The trial court instructed the jury concerning the out-of-pocket loss standard of fraud damages as follows:

"The amount of such award shall include the difference, if any, between the actual value of that with which the Plaintiff parted and the actual value of that with which [*sic*] was received. This is sometimes referred to as the out-of-pocket loss. Actual value means market value. Market value means the highest price for which real or personal property would sell on the open market. . . ."[2]

Wallis paid $15,000 to PHL but failed to receive an ownership interest in the corporation as promised, meaning she received no value; therefore, under this standard

---

[2]     At the time this case was tried, the pattern instruction for fraud damages based on the benefit of the bargain stated: "The amount of such award shall be the difference between the actual value of that which the plaintiff received and the value which it would have had if the fraudulent representation had been true. This is sometimes referred to as the 'benefit of the bargain.' " (Former BAJI No. 12.57.) This instruction was not given to the jury.

she is entitled to $15,000 in fraud damages. However, Wallis's argument in support of the damages is that PHL's fraud concerning Wallis's money gave PHL access to the antigen. She states: "Defendants made false promises and representations to Dr. Wallis concerning her 'buy-in' to the company and her shareholder status, and as a direct result of that fraud obtained access to Dr. Wallis'[s] antigen. The damages awarded properly reflect the value of the antigen Dr. Wallis gave up as a result of Defendants' fraud." This argument fails entirely to address the standard for fraud damages: out-of-pocket loss. Wallis's novel fraud-damages theory posits that she can recover values associated with ownership of the antigen based on PHL's fraud related to her money. She cites no authority for this theory. Indeed, she fails even to attempt to relate it to the out-of-pocket standard for fraud damages (the only fraud-damages theory presented to the jury), except to say that it reflected the market value of the antigen. PHL, however, did not defraud her out of the antigen, according to the jury.

Still attempting to support her argument that the jury could award damages based on PHL's use of the antigen despite the finding that PHL committed fraud only as to her money, Wallis states: "[T]he jury instructions set forth at length in PHL's opening brief tracked the allegations of the complaint and the evidence. They informed the jury that under Dr. Wallis'[s] theory of the case, *she allowed PHL access to her antigen based upon Defendants' false promises and representations concerning her opportunity to buy in to the company and become a shareholder.*" (Original italics.)

This was *not* an instruction to the jury; instead, it was merely a reading by the trial court of Wallis's theory of the case. In connection with this reading, which the trial court provided as a courtesy to Wallis, the court said: "I want to read you Plaintiff's summary of her theory of the case. I have given Plaintiff's [*sic*] this opportunity because she has the burden of proof in most instances. *This is a summary which was prepared by Plaintiff's counsel so it is to be regarded in the same weight* [*sic*] *as any other statement of counsel. It is not to be considered as evidence.*" (Italics added.)

14

Neither was it a recitation of the applicable law. It was nothing more than a summary of Wallis's theory, without any comment, explicit or implied, about the legal validity of the theory. Therefore, Wallis's recitation of and reliance on the comment on appeal is misleading.

Wallis concludes: "Defendants' fraud did not just involve the illusory purchase of shares. Defendants' false representations concerning Dr. Wallis'[s] money were the means by which they induced her to give them access to the antigen, and ultimately sell it to Upjohn. Dr. Wallis did not just 'give up' her money as a direct result of Defendants' fraud; she 'gave up' the antigen as well."

This argument is not tenable. Having asked the jury and having received the answer that *there was no fraud* related to the antigen, Wallis cannot now argue successfully that *there was fraud* related to the antigen. The jury concluded PHL *did not* make a false promise to Wallis or a false representation of material fact related to the antigen. If PHL did not make a false promise or a misrepresentation related to the antigen, PHL did not take the antigen by fraud, and PHL is not liable to Wallis for fraud damages related to the antigen. There simply is no other way to interpret the special findings relating to fraud.

That leaves, then, the question of what to do about the inconsistency between the fraud findings and the fraud damages awarded by the jury. Wallis provides no analysis concerning how the damages award can be justified considering the fraud only as to Wallis's money. Instead, she argues that the jury properly awarded the damages based on the fair market value of the antigen. PHL, on the other hand, contends that Wallis was entitled only to $15,000, the amount she paid to PHL for the shareholder buy-in. PHL has the better argument. When a special verdict concerning liability does not support the damages awarded, the damages award must be modified to conform to the liability finding if the amount of damages properly awarded is definite. (See *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 956-962

15

[punitive damages struck when no finding of tort in special verdict]; see also *Orthopedic Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 547 [court may modify judgment on special verdict when record sufficiently definite].)  That is the case here.  The damage resulting from PHL's fraud relating to Wallis's money is $15,000, the amount of Wallis's out-of-pocket loss, and not $1,944,997.  Accordingly, we must modify the judgment to reflect the proper amount.

Having concluded that the fraud damages award against PHL could only have been $15,000, the amount Wallis paid to PHL for shares in the corporation, we also conclude, by the same reasoning, that the fraud damages awarded against the individual defendants could only have been the amount Wallis paid to each of them for shares in the corporation -- that is, $2,000 to Wichmann, $2,000 to Hanzo, and $1,000 to Holmes. Therefore, the fraud damages awarded to Wallis against the individual defendants (Wichmann -- $259,330; Hanzo -- $259,330; Holmes -- $129,665) must be reduced to the amount paid by Wallis, except, of course, as to Hanzo, whose successors settled with Wallis and are not parties to this appeal.

II

*Punitive Damages*

Based on its finding that PHL committed fraud relating to Wallis's money, the jury awarded $500,000 in punitive damages.  (No punitive damages were awarded against the individual defendants.)  On appeal, PHL contends that, in light of the required reduction of the compensatory fraud damages to $15,000, the punitive damages award (now more than 33 times the compensatory damages award) is constitutionally excessive because it is grossly disproportionate to the compensatory damages award.  Wallis responds that the reprehensibility of PHL's conduct justifies the full punitive damages award even if we reduce the compensatory damages award.  We conclude that the punitive damages award must be reduced to $150,000, or 10 times the compensatory

16

damages award, because (1) PHL offers to accept that amount as constitutionally permissible and (2) any higher amount would surely violate PHL's due process rights.

"The due process clause of the Fourteenth Amendment to the United States Constitution places constraints on state court awards of punitive damages. [Citations.] . . . . [¶] In *State Farm* [*Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 418 [155 L.Ed.2d 585, 601] (*State Farm*)], the high court articulated 'three guideposts' for courts reviewing punitive damages: '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' [Citations.]" (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712.) "In deciding whether an award of punitive damages is constitutionally excessive under *State Farm* and its predecessors, we are to review the award de novo, making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct. [Citations.]" (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172.)

As will be seen, the essential guideposts in determining the upper limit of punitive damages in this case are moderate reprehensibility (as compared to other punitive damages cases) and the ratio between the compensatory damages (which, with the modification of compensatory damages, stands at more than 33 to 1). Neither party discusses the third guidepost (difference between punitive damages and authorized civil penalties), and neither will we, although we note in passing that there appear to be no authorized civil penalties.

17

A.      *Reprehensibility*

The first guidepost we consider is reprehensibility.  This is the only guidepost that Wallis relies on to justify the award.  We conclude that, although PHL's conduct was reprehensible, it was not extremely so.

The United States Supreme Court has identified five factors to consider in determining the degree of reprehensibility:  (1) "the harm caused was physical as opposed to economic"; (2) "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others"; (3) "the target of the conduct had financial vulnerability"; (4) "the conduct involved repeated actions or was an isolated incident"; and (5) "the harm was the result of intentional malice, trickery, or deceit, or mere accident."  (*State Farm, supra,* 538 U.S. at p. 419.)

"The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.  It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. [Citation.]"  (*State Farm, supra,* 538 U.S. at p. 419.)

We therefore consider the reprehensibility factors as they apply to this case.

First factor:  Here the harm was purely economic, not physical.

Second factor:  The tortious conduct did not evince an indifference to the health or safety of others.

Third factor:  Wallis was financially vulnerable.

Fourth factor:  The money was obtained by PHL in one transaction; however, it could be said that the deceit was at least continuing, if not repeated.

Fifth factor:  The deceit was intentional.

18

Therefore, of the five factors, at least two, and probably three, weigh in favor of a finding of reprehensibility: vulnerability, intentionality, and probably continuing conduct. Absence of physical harm or indifference to health and safety weigh against a finding of reprehensibility. Therefore, this is a case of moderate reprehensibility.

Wallis argues that the reprehensibility is rather more extreme. Keeping in mind that reprehensible conduct is, by definition, reprehensible in all instances and that extreme reprehensibility is found only in exceptional cases, we conclude that this case does not rise to the level of extremely reprehensible cases. Comparison to a recent case of extreme reprehensibility illustrates the moderation in this case. In *Bullock v. Philip Morris* USA, Inc. (2011) 198 Cal.App.4th 543 (*Bullock*), a cigarette manufacturer intentionally deceived smokers for several decades concerning the adverse health effects of smoking. (*Id.* at p. 550.) A jury awarded a smoker who contracted lung cancer $850,000 in compensatory damages and $13.8 million in punitive damages. (*Ibid.*) The Court of Appeal, Second Appellate District, Division Three, upheld the punitive damages award, finding that all five reprehensibility factors were present. (*Id.* at pp. 560-563.) The court concluded: "In light of such extreme reprehensibility, including the vast scale and profitability of Philip Morris's misconduct, and its strong financial condition, the $13.8 million in punitive damages, approximately 16 times the compensatory damages award, is not unconstitutionally excessive." (*Id.* at p. 550.)

The conduct in *Bullock*, involving physical harm and acute indifference to health and safety, was extremely reprehensible, while the conduct in this case was only moderately so.

B.      *Relation to Compensatory Damages*

The second guidepost we consider is the disparity between compensatory and punitive damages. Considering the moderate reprehensibility, we conclude that the more than 33-to-1 ratio between compensatory damages and punitive damages is constitutionally excessive.

The United States Supreme Court stated in *State Farm*: "[W]e have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. [Citations.] We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [a prior case], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. [Citation.] We cited that 4-to-1 ratio again in [another case]. [Citation.] The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. [Citation.] While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 [citation] or, in this case, of 145 to 1." (*State Farm, supra,* 538 U.S. at pp. 424-425.)

Wallis contends that PHL's fraud was intentional and it cheated her out of substantial profit in its fraud relating to her money. But even considering these factors, a case of no more than moderate reprehensibility cannot justify a punitive damages award more than 33 times greater than the compensatory damages award. This case is not like *Bullock,* in which extreme reprehensibility justified a high ratio of 16 to 1. Furthermore, PHL is not a large corporation like the cigarette manufacturer in *Bullock*.

While the punitive damages award here was only about one-fourth of the jury's original compensatory damages award of more than $1.9 million, that ratio between punitive and compensatory damages no longer exists because the compensatory damages award must be reduced to $15,000. Accordingly, because we conclude that the

20

compensatory damages award against PHL should have been set at $15,000, the punitive damages award, as it stands, is constitutionally excessive and must be reversed.

That leaves the question of what appellate remedy to invoke. In this regard, PHL states that "the constitutionally permitted maximum" in this case is "$150,000 (ten times the compensatory award against PHL)." And PHL states it is willing to waive its right to a new trial on the punitive damages issue if the judgment is reduced below "the legally permissible amount." We agree that a punitive damages award of more than $150,000 would violate due process under the circumstances of this case. (See *State Farm, supra,* 538 U.S. at p. 424-425 [normally, awards exceeding a single-digit ratio violate due process].) We also agree that prolonging any aspect of this case that need not be prolonged is against the public interest and the interest of the parties. Therefore, rather than reverse and remand for a new jury trial on punitive damages, we modify the punitive damages award against PHL to $150,000.

### III

#### *Equitable Relief*

After the jury trial ended, the court held proceedings on the equitable relief requested by Wallis. The court imposed a constructive trust of $671,262 against PHL for royalties PHL received for the antigen from Upjohn and $562,500 for the noncompetition agreement. After the court issued its ruling on the equitable issues, PHL requested a statement of decision, but the trial court denied the request as untimely. On appeal, PHL contends that the trial court prejudicially erred by denying the request for a statement of decision. We conclude the request was proper and should have been granted. We also conclude that, because Judge Mock has been disqualified, the only remedy for this error is remand for a new trial.[3]

---

[3]    PHL also contends that the granting of equitable relief based on unjust enrichment cannot stand because (1) Wallis had an adequate remedy at law, (2) enforcement of the

21

Code of Civil Procedure section 632 states in relevant part: "In superior courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial. The request must be made within 10 days after the court announces a tentative decision . . . ."

The purpose of a statement of decision is to provide an explanation of the factual and legal basis for the trial court's decision. (*Onofrio v. Rice* (1997) 55 Cal.App.4th 413, 425.) It gives the parties and the appellate court a clear understanding of the facts and law relied on by the court to reach its decision. (*Slavin v. Borinstein* (1994) 25 Cal.App.4th 713, 718.) If a party does not request a timely statement of decision, all intendments favor the ruling of the trial court and an appellate court must assume the trial court made whatever findings are necessary to sustain the judgment, as long as those findings are supported by substantial evidence. (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792-793, superseded by statute on another issue as stated in *In re Zacharia D.* (1993) 6 Cal. 4th 435, 448.)

"[A] trial court's failure to issue a statement of decision can have a significant adverse effect on that party's ability both to assess whether an appeal is justified and, if an appeal is filed, to present an effective challenge to the trial court's decision." (*Gruendl v. Oewel Partnership, Inc.* (1997) 55 Cal.App.4th 654, 661.) For this reason, a trial court's failure to file a statement of decision following a timely request constitutes

---

agreement that Wallis would own the antigen was time-barred, and (3) there was no evidence of an agreement between PHL and Wallis that Wallis would own the antigen. PHL bases these contentions on the argument that the trial court relied on some kind of contract theory in granting equitable relief. We need not consider these contentions because the denial of the request for a statement of decision was reversible error. We also note that the trial court's apparent theory for granting equitable relief was mistake of fact, not a contract theory.

"per se reversible error." (*Espinoza v. Calva* (2008) 169 Cal.App.4th 1393, 1397-1398; *Miramar Hotel Corp. v. Frank B. Hall & Co.* (1985) 163 Cal.App.3d 1126, 1127-1130.)

Here, the trial court spread its rulings on equitable issues over three separate occasions. As detailed in the statement of procedure above, the court ruled on most equitable issues on September 26, 2000. However, it stated that it did not intend its decision to be final at the time because it had not made a decision concerning interest. It also took under submission whether to require an accounting or appoint a receiver. On November 16, 2000, the court announced a decision concerning interest but reserved the issue of whether to appoint a receiver. Finally, on December 28, 2000, the court announced that it would not appoint a receiver.

There can be no dispute that PHL requested a statement of decision within 10 days after the trial court issued the last part of its piecemeal tentative ruling. The trial court announced its tentative decision concerning the receivership issue on December 28, 2000, and PHL filed its request for statement of decision on January 5, 2001. The question is whether this request preserved PHL's right to obtain a statement of decision on all equitable relief issues. We conclude that PHL's request was timely and adequate to require a statement of decision on all equitable relief issues.

Neither the statute (Code Civ. Proc., § 632) nor the rule applying the statute (Cal. Rules of Court, rule 3.1590) addresses whether the court's announcement of a tentative decision on some issues but reservation of other issues for later decision initiates the period during which a party must request a statement of decision. PHL argues that a tentative decision is not "announced" for the purpose of the statute until the court has ruled on all reserved issues. On the other hand, Wallis argues that the time period begins to run from the trial court's announcement of its decision on each question of fact. We conclude that the only reasonable and workable interpretation of the statute is that the time to request a statement of decision runs from the time the trial court completes the announcement of its decision on all reserved issues.

23

As noted, Code of Civil Procedure section 632 requires that "upon the trial of a question of fact by the court" the trial court must issue a statement of decision if a party makes a proper request "within 10 days after the court announces a tentative decision." Rule 3.1590(b) of the California Rules of Court states that a tentative decision is not binding on the trial court and may be modified, and rule 3.1590(d) allows that "[w]ithin 10 days after announcement or service of the tentative decision, whichever is later, any party that appeared at trial may request a statement of decision to address the principal controverted issues."

While the statute and rule do not expressly provide for the situation in which the trial court announces part of its decision but reserves some issues, common sense dictates that, for the purpose of the statute and rule, the 10 days does not begin to run until the trial court completes the announcement of its tentative decision on all issues. Nothing in the statute or rule provides for multiple requests for statements of decision as to individual issues. Therefore, the best reading of the statute and rule is that the 10 days begin to run when the trial court has announced its tentative decision on all controverted issues.

Wallis suggests, however, that because the statute applies "upon the trial of a question of fact by the court" (Code Civ. Proc., § 632), the time limit applies to the trial court's announcement of a tentative decision on each question of fact. In this case, such an interpretation would have required PHL to make three separate requests for a statement of decision to preserve all issues covered in the trial court's trifurcated announcement of its decision on the controverted issues. Other than the statute's reference to "upon the trial of a question of fact by the court," Wallis offers no authority for this position, and we find no evidence that the Legislature intended this strained and unworkable interpretation. The wording of the statute, "upon the trial of a question of fact by the court," simply refers to a court trial, as opposed to a jury trial.

24

Applying the proper interpretation of Code of Civil Procedure section 632, we conclude that the trial court erred by denying PHL's request for a statement of decision made within 10 days after the court completed its announcement of its tentative decision on all controverted issues, ending with the court's tentative decision relating to appointment of a receiver.

Wallis argues that, even if PHL's request for a statement of decision was timely, PHL is not entitled to reversal because the request did not identify material issues for the trial court to resolve. (See *Marriage of Garrity & Bishton* (1986) 181 Cal.App.3d 675, 686-687 [failure to make findings on immaterial issues not error].) Wallis claims that "many" of the 18 issues listed in PHL's request for a statement of decision were not material. Logically, however, the argument that "many" issues *were not* material is, in effect, a concession that at least some of the issues *were* material. Therefore, this argument fails because if any of the issues were material then a statement of decision was required.

Normally, the proper appellate remedy for improper denial of a request for a statement of decision is to reverse and remand for preparation of a statement of decision. (*Espinoza v. Calva, supra,* 169 Cal.App.4th at p. 1398.) However, that is impossible here. Judge Mock, who heard the case, is no longer available because he was disqualified. Therefore, the only appropriate appellate remedy in this case is a remand for a new trial on the equitable causes of action.

IV

*PHL's Other Arguments Concerning Jury Verdicts*

PHL contends that it is entitled to a new jury trial for several reasons: (1) the jury verdict is internally inconsistent because the special verdicts with respect to fraud are inconsistent with the amount of damages (which is essentially the argument we considered in part I, above); (2) discovery on the cross-complaint after the trial on the complaint revealed that Wallis and her attorney systematically misrepresented material

25

information; (3) Wallis disqualified Judge Mock before judgment was rendered; and (4) a jury instruction concerning proof of an invention was improper.

Having made these contentions, however, PHL states that it will waive them on appeal if we reduce the judgment on the jury verdict as requested. In the caption of this section in its opening brief, PHL states: "If this court is not inclined to give the jury's special verdict effect by reducing the damages to those that are legally permissible under the jury's factual findings, then a new trial is required." (Unnecessary capitalization, bold text & underscoring omitted.) PHL continues: "If the Court reduces the damages to legally permissible amounts, as set forth above, then PHL Parties are prepared to accept such a modified judgment and waive any rights they have to a new trial . . . ."

Because we have reduced the compensatory damages award against PHL on the jury verdict to $15,000 (with corresponding reductions for the individual defendants) and have reduced the punitive damages award to $150,000, as requested by PHL, we accept PHL's waiver of consideration of its contentions that it is entitled to a new jury trial. We therefore need not discuss those contentions.

V

*Prejudgment Interest and Setoff*

Before Judge De Alba entered judgment in July 2010, the parties submitted briefing on the issue of prejudgment interest on the jury verdicts and the court's equitable relief. Wallis argued that she was entitled to prejudgment interest from the dates of the verdicts in June 2000, while PHL argued that Wallis was not entitled to prejudgment interest at all because the net amount of her recovery was not made certain until the cross-complaint was settled in April 2010. Judge De Alba concluded that Wallis was entitled to prejudgment interest from the dates of the jury verdicts but that PHL was entitled to an offset in the amount of the settlement on the cross-complaint.

With respect to prejudgment interest, Judge De Alba awarded Wallis (1) prejudgment interest on the punitive damages from the date of the verdict at the rate of

26

seven percent per annum plus (2) prejudgment interest on the net recovery of compensatory damages (verdicts plus equitable relief minus settlement amount of cross-complaint) from the date of the verdict at a rate of seven percent per annum. (Because of our conclusion that the verdicts must be reduced and the equitable relief retried, we need not recount the actual amounts computed by Judge De Alba upon which interest was to be paid. We also need not consider interest on the equitable award.)

On appeal, the parties renew their arguments concerning prejudgment interest. We conclude Judge De Alba erred in calculating prejudgment interest by using the amount PHL obtained in settlement of the cross-complaint as an offset of damages awarded by the jury.

Civil Code section 3287, subdivision (a) provides for prejudgment interest as follows: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ." Rule 3.1802 of the California Rules of Court provides: "The clerk must include in the judgment any interest awarded by the court and the interest accrued since the entry of the verdict."

" 'Damages are deemed certain or capable of being made certain within the provisions of subdivision (a) of [Civil Code] section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage.' [Citation.]" (*Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 958.) "[W]here the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate. [Citation.]" (*Id*. at p. 960.)

Here, as Judge De Alba concluded, Wallis's damages were made certain by the jury's verdicts. (Cal. Rules of Court, rule 3.1802; *Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, 935 [damages "are certain or capable of being made certain, e.g., the date the jury's verdict is entered".) Although we must reduce those verdicts on

27

appeal to conform to law, we see no reason such a reduction would contradict Judge De Alba's conclusion.

PHL claims that Wallis's damages could not be made certain until the cross-complaint was resolved. We disagree. The causes of action in the cross-complaint were independent of the causes of action in the complaint -- for example, the causes of action in the cross-complaint were not pleaded as an offset to contractual damages. Therefore, the existence of a cross-complaint did not make damages on the complaint uncertain.

On the other hand, Wallis contends that Judge De Alba erred by awarding prejudgment interest only on the difference between (1) damages awarded to Wallis on the complaint by jury verdict and (2) the amount of the settlement on the cross-complaint. We agree.

When a plaintiff sues on a contract, and the defendant establishes that not all the money is owed because the plaintiff has not fully complied with the contract, the plaintiff is entitled to prejudgment interest on the amount of the contract only after the amount is offset for the noncompliance. "It is settled that when a plaintiff sues for a liquidated sum and the defendant establishes an offsetting claim based upon defective workmanship or defective performance of the same contract by the plaintiff, the amount of the former is to be offset against the latter *as of the due date of the original debt* and only the balance bears interest. [Citation.]" (*Burgermeister Brewing Corp. v. Bowman* (1964) 227 Cal.App.2d 274, 285, original italics.) "[T]he court may properly allow interest only on the balance found to be due after deduction of such offsets and payments. The reason is that to that extent only has the plaintiff been damaged." (*Hansen v. Covell* (1933) 218 Cal. 622, 631; see also *Great Western Drywall, Inc. v. Roel Construction Co., Inc.* (2008) 166 Cal.App.4th 761, 770 [offset of contractual damages allowed for negligence in workmanship related to same contract].)

Based primarily on these precedents relating to contracts, PHL asserts that Judge De Alba properly offset Wallis's damages for fraud with the amount of the settlement.

The assertion is without merit. Here, the damages sustained by Wallis as a result of PHL's fraud were not reduced by any damages Wallis caused to PHL based on other conduct. Unlike the circumstance of a contract in which the plaintiff, though prevailing, may not be entitled to recover the full extent of the contract because the plaintiff did not fully comply with the contract, there is no similar reasoning to establish that Wallis is not entitled to the full extent of her fraud damages, even if she is (or was) liable to PHL for other reasons.

Accordingly, Judge De Alba erred in offsetting Wallis's fraud damages with the settlement on the cross-complaint. Wallis is entitled to interest computed on the fraud damages (and punitive damages) from the dates of the verdicts awarding those damages. (Civ. Code, § 3287, subd. (a); Cal. Rules of Court, rule 3.1802.) Because we modify the judgment reducing Wallis's fraud and punitive damages, prejudgment interest must be recomputed on remand.[4]

VI

*Contentions We Need Not Resolve*

A.    *Duplicative Awards*

PHL contends that Wallis's legal and equitable theories both resulted in awards for damages for the same loss. Therefore, argues PHL, Wallis must elect which remedy to receive. Because we reverse the judgment as to the equitable relief, we need not consider this contention.

B.    *Basis of Equitable Relief*

Citing several of what she characterizes as Judge Mock's "findings" supporting the equitable relief granted, Wallis contends that the trial court (1) improperly determined that PHL acquired the antigen through a mistake of fact (referring to PHL's belief that it

---

[4]    Our conclusion makes it unnecessary to consider Wallis's other arguments against the setoff applied by Judge De Alba.

29

owned the antigen) and (2), because of that improper finding, the court improperly based its award of equitable relief on PHL's royalties from the antigen rather than PHL's profits. This contention fails because Judge Mock made no "findings" upon which we would measure the award of equitable relief. There was no statement of decision. And, in any event, the entire equitable relief award must be reversed and remanded for a new trial because Judge Mock improperly denied PHL's request for a statement of decision.

C.     *Posttrial Royalties*

In a related contention, Wallis argues that, even assuming royalties was the proper measure of the amount of equitable relief, Judge De Alba abused his discretion by denying Wallis's request for an award of posttrial royalties. We also need not consider this contention in light of the necessary remand for a new trial on the equitable causes of action.

## DISPOSITION

The judgment as to the jury verdicts is modified to award Wallis $15,000 against PHL, $2,000 against Wichmann, and $1,000 against Holmes in compensatory damages and $150,000 against PHL in punitive damages. With those modifications, the judgment as to the verdicts is affirmed but remanded for recalculation of prejudgment interest consistent with this opinion.

The judgment as to the equitable relief is reversed and remanded for a new trial.[5]

---

[5]     PHL's request for judicial notice filed October 5, 2012, and PHL's motion to strike portions of Wallis's reply brief or, in the alternative, to augment the record on appeal filed December 21, 2012, are denied.

The parties will bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)


                                                _____NICHOLSON_____, Acting P. J.


We concur:


_____ROBIE_____, J.


_____BUTZ_____, J.