Filed 11/17/20 Harouche v. The Wilshire Corp. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MICHEL HAROUCHE, | B297364 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SC124859) |
| v. | |
| THE WILSHIRE CORPORATION, et. al. | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Nancy L. Newman, Judge.  Affirmed in part; reversed in part and remanded.

The Ryan Law Firm, James S. Link, Kelly F. Ryan and Jillian M. Reyes for Defendants and Appellants.

Law Offices of Stephen S. Smith and Stephen S. Smith for Plaintiff and Respondent.

—————————————————

## *INTRODUCTION*

Plaintiff Michel Harouche hired defendant Stephen Sisca and Sisca's company, defendant The Wilshire Corporation (TWC) to serve as his agents, overseeing and managing the construction of Harouche's multi-million dollar residence in Malibu (the project). Without Harouche's knowledge or consent, Sisca and TWC conditioned the award of the construction contract on the general contractor's agreement to kickback $235,000 of Harouche's first $350,000 payment to the contractor, plus an additional 4 percent of all other money Harouche would pay the contractor.[1] General contractor John Finton agreed to these terms in writing on behalf of his company, Finton Construction, Inc. (FCI or contractor), and paid Sisca and TWC the kickbacks accordingly. About a third of the way into the seven-year project, Sisca proposed and Finton agreed to fraudulently increase the cost of change orders for the project, and split the profit from the marked up amounts.[2]

After learning of the kickbacks and fraud from a third party, Harouche sued Sisca, TWC, Finton, and FCI. Harouche settled with Finton and FCI for $1,100,000 in damages. Following a bench trial, the court found Sisca and TWC liable for breach of fiduciary duty and fraud. The court awarded $1,980,837.72 in damages against Sisca and TWC. That number consisted of three amounts: (1) $235,000 from the initial

---

[1] The contract Harouche signed allowed for TWC to receive 2.5 percent of all monies Harouche paid to the general contractor. Thus, this side agreement between Sisca and the contractor gave TWC an additional undisclosed 1.5 percent of the payments Harouche made to the contractor.

[2] Change orders are the mechanism within the construction contract for modifying the project and increasing the cost of it.

2

kickback, (2) $205,011.46 from the 1.5 percent kickback of all amounts Harouche paid FCI, and (3) $1,540,826.26 from fraudulent change orders.

On appeal, Sisca and TWC do not challenge the trial court's liability findings. Rather, they make three arguments about damages. First, they assert the damages based on change orders were not supported by substantial evidence. Second, they argue the trial court failed to consider "special circumstances" that justified their receipt and retention of the initial $235,000 kickback. Third, they argue the trial court was required to award them an offset of $608,000 due to FCI's release of its cross-complaint in that amount as part of its settlement with Harouche. We conclude the trial court erred in calculating the change order damages. We modify the amount of those damages and remand for the trial court to recalculate prejudgment interest and rule on the $608,000 offset.

### FACTS AND PROCEDURAL BACKGROUND

Although there were many witnesses who testified and many subcontractors who worked on the project, three people are at the center of this appeal:

1. Harouche – the owner of the residence
2. Sisca and his company TWC – the project manager
3. Finton and his company FCI – the contractor

Several formal contracts and informal arrangements among these people drive the analysis of the parties' dispute. We start our factual synopsis with those agreements.

### 1. *Project Management Agreement Between Harouche and TWC*

In September 2008, Harouche and TWC entered into a project management agreement, in which TWC agreed to act as Harouche's project manager on the project. TWC was responsible for managing "all aspects of the pre-construction and construction

3

process," including "interviewing negotiating and hiring a general contractor" and "management of general contractor." The agreement stated TWC had been acting in this capacity on behalf of Harouche since April 1, 2008 and would continue to act on Harouche's behalf until project completion. Harouche agreed to pay TWC a project management fee of $200,000, plus $1,600 for each trip Sisca made to California to manage the project. Pursuant to this agreement, Harouche eventually paid Sisca and TWC fees totaling $262,000, plus travel expenses of $63,400.

## 2.     *Construction Contract Between Harouche and FCI*

On August 6, 2008, Harouche entered into a "Stipulated Sum Construction Agreement" with FCI. FCI agreed to construct the project for $10,265,218.31, which included the contractor's fee. The contractor's fee was 12.75 percent of the contract, which included "2.50% to Sisca."[3] The construction contract provided that "The Contract Sum may be changed only by a written Change Order Addendum."

## 3.     *Kickback Agreement*

Unbeknownst to Harouche, on the same day that Harouche and FCI entered into the construction contract, TWC and FCI entered a side agreement for the project. As a condition of being awarded the construction contract, FCI agreed to pay TWC additional amounts that were not provided for in the contracts executed by Harouche. First, FCI agreed to pay TWC a $235,000

---

[3]     In addition to the fees set out in the project management agreement, Harouche agreed in the construction contract that TWC would receive 2.5 percent of the entire construction contract cost. FCI effectively received a contractor fee of 10.25 percent of the contract after TWC took its cut of the contractor fee. (At trial, the parties disagreed on whether Harouche was aware of the provision for the 2.5 percent payment from FCI to Sisca, but the trial court found that at least Harouche's financial advisor was aware of it.)

4

project "referral fee" out of the initial $350,000 payment that Harouche was to make to FCI under the Construction Contract. Second, FCI agreed to pay TWC 4 percent of all monies that Harouche paid FCI under the Construction Contract, rather than the 2.5 percent that the Construction Contract provided.

In accordance with this kickback agreement, FCI paid TWC $235,000 "within one day of Harouche making his first payment to FCI" under the Construction Contract. FCI paid TWC 4 percent of the $13,667,431.81 that Harouche paid FCI, rather than the 2.5 percent that had been recited in the construction contract. The extra 1.5 percent amounted to $205,011.46.

### 4. *Fraudulent Change Orders*

During the first third of the project, Sisca suggested to Finton that they use the change order process from the construction contract to make extra money for themselves. Sisca proposed that they increase the amounts due to subcontractors for the change orders, submit the inflated subcontract payments to Harouche, and then split the profit 50/50. In an April 2011 email, Sisca wrote Finton: "On a separate note I'm looking to make us some more money on the Harouche Job. Please confirm you are good with a 50/50 split on anything I can get us on extras/change orders." Finton replied via email that he agreed to the arrangement. Sisca told Finton that Harouche would never find out about the altered change orders.

Thereafter, Finton transmitted to Sisca the subcontracts that FCI had entered into with subcontractors for the change order work. Sisca then altered the subcontracts to increase the cost of the work. The "falsified subcontracts" were submitted to Harouche for payment.

Harouche introduced into evidence nine subcontracts that had been forged to reflect an unearned increased price for the work. The evidence included both the original and the altered

5

subcontract for the same work. Finton later attested that the original subcontracts he gave to Sisca to alter were "real" and reflected the "true cost" of the change order work described in those subcontracts. Sisca provided each of the inflated subcontracts to Harouche for payment.

Finton testified that he did "not recall the total, collective inflated amounts and the total collective amount of money FCI paid to TWC under this scheme." But, he did recall that "TWC's 50% plus 4% of FCI's 50% added up to a minimum of many hundreds of thousands of dollars."

By the time the project was completed in 2015, Harouche had paid FCI $13,667,431.81. That amount was $3,042,213.50 above the original construction contract.

## 5. *Harouche Sues Sisca/TWC and Finton/FCI*

On October 13, 2015, Harouche filed a complaint against Sisca, TWC, Finton, and FCI. He asserted claims for breach of contract, fraud, negligent misrepresentation, breach of fiduciary duty, and negligence, and sought damages of $2.6 million. FCI filed a cross-complaint against Harouche, claiming Harouche failed to pay FCI the last "payment application #57" under the Construction Contract. FCI sought damages of $608,000.

Sisca and TWC also filed a cross-complaint against Harouche. They asserted claims for breach of contract and "common count." They claimed that Harouche owed them $104,000 under the project management agreement.

During the pendency of this case, FCI and Finton filed for bankruptcy. Apparently with the approval of the bankruptcy trustee, Harouche then reached a settlement with FCI and Finton, where Finton and FCI stipulated to a $1,100,000 judgment in favor of Harouche. Finton and FCI also agreed to dismiss their cross-complaint, and to admit to facts demonstrating that the judgment against them was non-

6

dischargeable under sections 523(a)(2)(A) and (a)(6), title 11 of the United States Code. Those facts were set forth in Finton's declaration, which was attached to the settlement agreement.

Although Finton and FCI stipulated to a judgment of $1,100,000, the settlement did not require them to pay that amount immediately. Instead, because of the bankruptcy, Harouche agreed to forbear from collecting the judgment in return for FCI making small monthly payments, commencing upon approval of its bankruptcy plan of reorganization. Only at the end of the plan period would FCI and Finton be obligated to pay the rest of the judgment.

In January 2017, Harouche, Finton, and FCI filed an application with the trial court to determine that their settlement was entered into in good faith. Sisca and TWC contested the motion for the good faith settlement. On March 8, 2017, the bankruptcy court approved the settlement agreement between FCI and Harouche. On May 25, 2017, the trial court approved the good faith settlement and entered "Judgment Pursuant to Settlement" against FCI and Finton.

### 6. *Trial and Judgment*

In January 2018, the court held a bench trial for the claims against Sisca and TWC and on their cross-complaint. The parties filed posttrial briefs in March and April 2018. On June 12, 2018, the court issued its proposed statement of decision, finding in favor of Harouche. The parties objected to certain aspects of the decision. Sisca and TWC argued that the court miscalculated the damages associated with the fraudulent change orders. They also argued that the trial court should have offset their damages by the amount FCI's released cross-complaint against Harouche.

On August 14, 2018, the trial court issued its final statement of decision and reserved punitive damages for further

7

proceedings.[4] The court found "[t]he contract between Sisca and Harouche obligated Sisca to act as Plaintiff's agent with respect to the construction project." The court determined Sisca breached his fiduciary duty to Harouche "by participating in a scheme with Finton to make additional money off of the construction project at the expense of Harouche." The court stated that Sisca violated his fiduciary duty by receiving undisclosed fees from Finton while advocating for Finton to receive the contract, and by arranging to increase the subcontractors' pricing and splitting the increase with Finton. The court also found Sisca and TWC committed fraud, based on the additional 1.5 percent of monies that Sisca and TWC received from Finton and the altered change orders.[5]

In total, the court found the following damages, broken into three categories: (1) $235,000 from the initial kickback ("referral fee"), (2) $205,011.46 from the 1.5 percent kickback on all amounts Harouche paid FCI, and (3) $1,540,826.26 from fraudulent change orders. The court retained jurisdiction to award Sisca and TWC an offset if and when FCI and Finton made a payment to Harouche under the settlement agreement.

Sisca and TWC renewed their objections on the calculation of damages for the change orders and the offset of the settlement between FCI and Finton and Harouche.

## 7.     *Entry of Judgment*

After the trial court issued the final statement of decision, but before judgment was entered against Sisca and TWC, FCI paid Harouche $18,000 under the bankruptcy plan of

---

[4]     On November 15, 2018, the court issued a separate statement of decision denying punitive damages.

[5]     The court ruled against Harouche on his breach of contract and negligent representation causes of action.

8

reorganization.  On March 5, 2019, Harouche filed notice of the payment and requested an offset of $18,000 from the judgment.

On March 19, 2019, the court signed a revised judgment, reducing damages by $18,000.  The revised judgment awarded Harouche $1,962,837.72 in damages against Sisca and TWC, plus prejudgment interest of $990,486.45.  The court awarded Harouche costs as the prevailing party, and stated Sisca and TWC "shall take nothing by their Cross-Complaint."[6]  The court reserved "jurisdiction to calculate and award offset credits to [Sisca and TWC] for any future settlement payments that are made to Harouche by defendants Finton Construction, Inc. and/or John Finton."

Sisca and TWC filed a timely notice of appeal.

### DISCUSSION

Sisca and TWC argue (1) the damages based on change orders were not supported by substantial evidence, (2) the trial court failed to consider "special circumstances" that justified defendants' receipt and retention of the initial $235,000 kickback, and (3) the trial court was required to award defendants an offset of $608,000 due to FCI's release of its cross-complaint in that amount as part of its settlement with Harouche.  We address each in turn.

### 1.    *The Damages for the Fraudulent Change Orders Were Miscalculated*

In its statement of decision, the court awarded damages on nine change orders.  The first eight fraudulent change orders corresponded to eight invoices from seven subcontractors.  The ninth fraudulent change order corresponded to four subcontracts submitted by subcontractor Solar Electrical.  Sisca and TWC

---

[6]    The original judgment included the following:  "FCI shall take nothing by its Cross-Complaint."

9

argue that the $1,540,826.26 in damages attributed to fraudulent change orders was not supported by substantial evidence, and that the damages for the fraudulent inflation of change orders amounted only to $250,324. Specifically, Sisca and TWC argue the damages for the first eight change orders were miscalculated. Sisca and TWC also argue the court erred in awarding any damages for the Solar Electrical change order because Harouche never paid the fraudulent marked up amount.

"In reviewing a judgment based upon a statement of decision following a bench trial, we . . . apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings. [¶] A single witness's testimony may constitute substantial evidence to support a finding. [Citation] It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility. [Citation] 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' [Citation] Specifically, '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' " (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*).)[7]

---

[7] Harouche cites *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 507, and *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 61, for the proposition that a damage award can only be reversed if it was the result of passion or prejudice. These cases address arguments about excessive nonpecuniary damage awards in jury trials, and are inapt here.

a.      *The Court Miscalculated Damages on the First Eight*
        *Change Orders*

Sisca and TWC explain that the trial court indicated in the Statement of Decision that it intended to award damages equal to the difference between the original eight subcontracts and the corresponding fraudulent versions that were submitted in the change orders to Harouche for payment.  They assert that the court inadvertently awarded damages for the entire price of the altered subcontracts, not just the fraudulent portion.  We agree.

In its Statement of Decision, the court made the following findings on the fraudulent change orders:

"Paragraph 9 of the contract required Harouche to pay money above the stipulated sum only if it was part of a legitimate change to the scope of the construction of the residence requiring a change order.  It was established at trial that Harouche continued to add items onto the project which resulted in a significant number of change orders.  The number of change orders varied among the witnesses who testified, but it does appear that there were a significant number of change orders.

"The change orders appear to be legitimate; however, the agreement that Sisca and Finton reached with respect to marking up the amount provided by the subcontractor was a fraudulent act causing harm to Harouche.  Finton's declaration indicates that he transmitted to Sisca the real subcontracts that FCI had entered with the subcontractors to perform the change order work.  Unbeknownst to Harouche those subcontracts were altered to increase the cost of the work substantially above the true cost of that work.  Sisca was fully

11

aware of this fact.  Sisca submitted those falsified contracts to Harouche for payment of the inflated amount of the cost of the work.  Harouche then would pay that inflated amount to FCI.  Finton would take that payment and divide the inflated amount fifty-fifty between FCI and TWC.  FCI then paid to TWC its 50 percent, plus its 4 percent of FCI's 50 percent of the inflated amount.  Although Finton never saw the forged contract, Sisca told him that he altered the subcontracts.  It is noted that Sisca denies he altered the subcontracts."

In its analysis of damages attributable to these fraudulent change orders, the trial court stated:

"Sisca argues that the subcontract amount is not relevant to the damages claim because the change orders were based on various subcontract approvals.  However, in the Court's view, the clearly inflated and altered subcontracts is where the fraud occurred.  Although Sisca denies forging the subcontracts, the court doubts his credibility.  Further, it is clear he was aware of this process.  Finton testified that Sisca was responsible for the alterations and that they were done at his suggestion.

"There were eight subcontracts presented by plaintiff as evidence of the inflated amounts which were to be split by Finton and Sisca.

"*The difference between the original invoices noted above and the amount submitted to Harouche totals $1,427,425.*  The eight original subcontracts were admitted into evidence by stipulation.  Mr. Clark testified that he received corresponding

12

contracts for differing amounts and submitted those contracts to Harouche for payment.

"The Court is basing its damages award relative to the solar contract on the testimony of Mr. Johanson and his declaration (Exhibit 91) of Solar Electrical Systems. Mr. Johanson testified that he prepared four subcontracts for his work on the residence. The total of those contracts was $133,157.74. Mr. Clark [Harouche's employee tasked with paying invoices from the contractor] received an invoice for $245,819 which he submitted to Harouche. The difference is $112,661.26.

"The total damages awarded to the Plaintiff for the inflated subcontracts is $1,540.826.26. Subject to the good faith settlement deduction noted below, the Court will make an award to Plaintiff." (Emphasis added.)

The court's findings reflect that Harouche requested many changes in the project and that the change orders corresponded to legitimate work. The court found that the fraud occurred solely where Sisca altered the subcontracts to charge Harouche more money for the same work. Contrary to what Harouche argues on appeal, the court singled out this portion of the change orders as the basis for fraud damages – not the entire amount of each change order.

The trial court stated that it had evidence of both the eight original subcontracts and the corresponding eight altered versions of those subcontracts. The court calculated the damages to be the "difference between the original invoices noted above and the amount submitted to Harouche." We set forth those amounts in the table below.

13

| Subcontract | Original Invoice | Amount Submitted to Harouche | Difference (Resulting Damages) |
|---|---|---|---|
| Apollo Glazing Contractors – October 19, 2011 | $395,000 | $450,000 | $55,000 |
| Chris Ryan Wall Covering & Paint – March 21, 2014 | $8,340 | $13,000 | $4,660 |
| Chris Ryan Wall Covering & Paint – March 21, 2014 | $115,000 | $163,600 | $48,600 |
| Grand Heating – November 23, 2011 | $119,305 | $132,516 | $13,211 |
| Kruger Electrical – January 17, 2013 | $150,322 | $204,000 | $53,678 |
| LC Pools – June 30, 2011 | $196,430 | $255,380 | $58,950 |
| Preferred Contractors – October 31, 2011 | $143,300 | $149,500 | $6,200 |
| X-Tech Security – March 11, 2013 | $49,404 | $59,429 | $10,025 |
| **TOTALS** | **$1,177,101** | **$1,427,425** | **$250,324** |

The final, right-hand column of the table reflects the $250,324 difference between the original accurate invoices and amounts charged to and paid by Harouche for the eight subcontracts. The trial court was mistaken when it concluded the difference amounted to $1,427,425.

Harouche argues that the trial court intended to award the *full* amount of the altered subcontracts. He cites *Bardis v. Oates*

14

(2004) 119 Cal.App.4th 1, 13 (*Bardis*), in arguing "the trial court was free to decide that all of the eight Forged Subcontracts should be disallowed because the evidence overwhelmingly proved that [Sisca and TWC] acted fraudulently and in breach of their fiduciary duty regarding those subcontracts." In *Bardis*, the appellate court concluded the jury was entitled to give no weight to the fiduciary's post hoc explanation that the money he fraudulently took from the principal was for legitimate overhead costs. (*Id.* at pp. 12-13.)

*Bardis* is inapt: the trial court here determined that the "change orders appear to be legitimate" and were based on the many changes requested by Harouche during the project. In finding the change orders were not entirely fraudulent, the court rejected Harouche's claim of $3,042,213.50 in damages that represented the amount he paid in excess of the stipulated sum in the Construction Contract. The court found that the markup on "the amount provided by the subcontractor was a fraudulent act causing harm to Harouche." The trial court's statement of decision explicitly stated that it did not intend to award the full amount of the altered subcontracts, but rather it was awarding the "difference between the original invoices noted above and the amount submitted to Harouche."[8]

Harouche also asserts the court's $1,427,425 damages finding must stand because Sisca and TWC "never cited any evidence showing that any portion of the Contract Prices found in the eight Forged Subcontracts was true. The fact that Sisca

---

[8]    We do not address whether the trial court could properly have awarded as damages the entire amount of the change orders fraudulently issued or used some other calculation. The trial court stated that it was not making such an award, and the issue before us is whether the trial court made a calculation error in determining the amounts necessary to effect its award.

15

altered real subcontracts to create the Forged Subcontracts does not mean that some amounts in the Forged Subcontracts were 'real.' " We disagree with this characterization of the record.

At trial, plaintiff introduced statements from Finton, who attested that all the change orders were based on legitimate work and that Sisca marked up the cost of the subcontractor's legitimate work to make a profit. The court found "Finton to be a credible witness who has declared under penalty of perjury to statements against his own interest." In making its decision, the court referenced the exhibits of both the original and the altered subcontracts. This substantial evidence supported the court's conclusion that the original invoices were "real" and explained that the court did not intend to award damages for the nonfraudulent portion of the change order.

To the extent Harouche seeks affirmance based on Finton's declaration that Sisca received "hundreds of thousands of dollars" from the "forged subcontracts," the trial court did not find this argument or the conclusory statements persuasive. The court found damages for the nine change orders that Harouche introduced into evidence at trial. We do not reweigh the evidence on appeal. (*Thompson, supra,* 6 Cal.App.5th at p. 981.)

We conclude that the record supports only $250,324 in damages for the eight fraudulent change orders.

b.     *Solar Electrical Fraudulent Change Orders Were Properly Included in the Calculation of Damages*

The ninth change order was for work provided by Solar Electrical. The testimony at trial was that it was confusion over this subcontract that ultimately led to Harouche's discovery of Sisca and Finton's entire change order fraud scheme. It is undisputed that Harouche was billed $245,819 by Sisca in a change order for Solar Electrical's work dated July 16, 2012. Yet, Solar Electrical had only actually invoiced $133,160.74 in four

16

separate invoices ($17,650, $50,443.74, $57,467, and $7,600). The trial court found that the difference between the original invoices and the amount submitted to Harouche was $112,661.26.[9]

Citing testimony from one of Harouche's employees, Sisca and TWC argue the record indicates that Harouche never paid the additional $112,661.26 that constituted the fraud. Sisca and TWC misconstrue the testimony.

Witness John Clark, an employee of Harouche's whose job it was to make payments on the construction contract, testified that he directly contacted Solar Electrical to ascertain how much Harouche owed on the subcontract, as it was unclear from their records. Clark testified that the Solar Electrical office manager told him there was a remaining balance that had to be paid for Solar to turn on the system it had installed. Clark obtained copies of the four invoices from Solar Electrical, which totaled "in the 130,000 range" and compared them to the contract he had received from Sisca, which was "$240-some thousand." Referencing his emails with Sisca (exhibit 76), Clark testified that he confronted Sisca about the substantial discrepancy between what Solar Electrical had charged for the work, and what Sisca had billed Harouche. In the email, Clark wrote, "If you account for everything paid to date including monies to the previous companies prior to everything consolidating with Solar Electrical we have already paid approximately 225.4k, yet their services only total 135k." Sisca responded via email, instructing Harouche to pay the remaining balance directly to Solar

---

[9] The trial court appears to have miscalculated the amount: the difference is actually $112,658.26.

17

Electrical so that Solar Electrical would turn on the system. Clark stated he paid the balance to Solar Electrical.[10]

The testimony and emails evidence that Harouche paid more than $225,400 for the Solar work. We conclude the trial court reasonable found that the damages associated with the Solar subcontract was the difference between the original invoices and the amount submitted to Harouche, i.e. $112,658.26.

c. *Reduction in Damages for the Inflated Subcontracts*

The trial court awarded $1,540,826.26 in damages for the inflated subcontracts. Based the record, the damages for the inflated subcontracts were actually $362,982.26 ($250,324 for the first eight subcontracts and $112,658.26 for the Solar Electrical contract). "When the evidence is sufficient to sustain some but not all alleged damages, we will reduce the judgment to the amount supported by the evidence." (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 533 *(Behr).)* We modify the judgment to reduce the amount of damages on the nine inflated subcontracts to $362,982.26 ($1,540,826.26 - $1,177,844).

## 2. *$235,000 Damages was Properly Awarded for the "Referral Fee"*

Sisca and TWC argue the trial judge erred when it awarded Harouche the $235,000 "referral fee," the amount TWC required FCI to pay upon receiving the construction contract. Citing *Savage v. Mayer* (1949) 33 Cal.2d 548, 551 (*Savage*), Sisca and TWC assert the court failed to consider special circumstances underlying the payment by FCI to TWC, that should permit TWC to keep $235,000. We apply the aforementioned substantial evidence standard of review in reviewing the trial court's decision on this factual issue. (*Thompson, supra,* 6 Cal.App.5th at p. 981.)

---

[10]    Clark testified using round estimates. The court found the true amounts were slightly different based on the actual invoices.

*Savage* does not assist Sisca and TWC. "An agent, however, is not permitted to make any secret profit out of the subject of his agency. [Citations.] All benefits and advantages acquired by the agent as an outgrowth of the agency, exclusive of the agent's agreed compensation, are deemed to have been acquired for the benefit of the principal, and the principal is entitled to recover such benefits in an appropriate action. [Citation.] *In the absence of special circumstances,* moneys received by one in the capacity of agent are not his, and the law implies a promise to pay them to the principal on demand. [Citation.] It follows that the principal's right to recover does not depend upon any deceit of the agent, but is based upon the duties incident to the agency relationship and upon the fact that all profits resulting from that relationship belong to the principal." (*Savage, supra,* 33 Cal.2d at p. 551.)

Sisca and TWC rely on the italicized quoted language above in asserting there were special circumstances that "permitted the payment of the referral fee to TWC." Sisca and TWC admit "there are no cases that we can find—in or out of state— defining 'special circumstances,' " but nonetheless assert that their circumstances allowed them to retain the referral fee.[11]

Sisca and TWC characterize these "special circumstances" as follows: "The $235,000 referral fee is just compensation for 6 months' work without any payment . . . ." They assert, "It was Harouche who took advantage of Sisca in asking him to undertake due diligence on the purchase of the Malibu property for which there was no renumeration." Whether intended or not, Sisca and TWC essentially argue that they were entitled to

---

[11] We have found no appellate authority that applies *Savage's* "special circumstances" exception to allow an agent to retain a secret profit through the agency relationship, unbeknownst to the principal.

commit fraud because Harouche did not pay them fairly for their services in the six months from April 1, 2008 to September 23, 2008.  The trial court was not persuaded; nor are we.

The contract between Harouche and Sisca/TWC, dated September 23, 2008 stated:  "TWC has been acting in this capacity on behalf of Harouche since April 1, 2008.  TWC will continue to act diligently on behalf of Harouche until such time the Project is completed and ready for occupancy. . . .  In consideration for the services of TWC, Harouche will pay TWC a Project Management Fee of Two Hundred Thousand Dollars ($200,000)."  This provision reflects the parties' explicit agreement that the $200,000 project management fee was, in part, for the services Sisca had been providing "since April 1, 2008."  The trial court found that Harouche "ultimately paid Sisca and TWC "much more than" the $200,000 project management fee contained in the contract.  Harouche actually paid Sisca and TWC a project management fee of $262,000, plus travel expenses of $63,400.  Sisca and TWC also received 2.5 percent of the construction contract payments from FCI.  If Sisca and TWC believed they were entitled to additional compensation, they should have said so in the negotiations leading up to the September 23, 2008 contract.  Self-help was not a lawful option.

Sisca was Harouche's agent and fiduciary and was thus "not permitted to make any secret profit out of the subject of his agency."  (*Savage, supra,* 33 Cal.2d at p. 551.)  To the extent there is a "special circumstances" exception to this rule, substantial evidence supports the trial court's implied finding that no "special circumstances" existed that allowed Sisca and TWC to pocket the undisclosed fee.

20

### 3. Remand Is Necessary to Allow the Trial Court to Make Express Findings on the Claimed $608,000 Offset for FCI's Released Cross-Complaint

Sisca and TWC argue the trial court erred in failing to offset the judgment pursuant to Code of Civil Procedure section 877 by $608,000, the amount of FCI's cross-complaint against Harouche, which was released as part of FCI's settlement with Harouche.[12] The record does not indicate that the trial court made an express finding on this issue even though it was litigated by the parties. Accordingly, we remand to allow the trial court to make that determination.

#### a. Section 877 Settlement Valuation for Codefendants' Damages Offset

"Section 877 specifies circumstances under which an award of economic damages against a defendant may be offset by a codefendant's settlement. . . . Section 877 promotes the recovery of damages, the settlement of litigation, and the equitable apportionment of liability among tortfeasors, while limiting the double recovery of damages." (*LAOSD Asbestos Cases* (2018) 28 Cal.App.5th 862, 877-878 (*LAOSD Asbestos*).) Section 877 provides: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights . . . it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater." (§ 877, subd. (a).)

---

[12] All subsequent statutory references are to the Code of Civil Procedure unless indicated otherwise.

21

At issue here is the trial court's valuation of the Finton/FCI settlement for Sisca/TWC's damages offset under section 877. "Under subdivision (a) of section 877, the amount of the setoff is, in the absence of a stipulation, 'the amount of the consideration paid for [the release or dismissal].' But the amount of consideration paid within the meaning of section 877, subdivision (a) is not necessarily the amount of money paid. Often 'the amount of the offset is clouded by injection of noncash consideration into the settlement.' " (*Franklin Mint Co. v. Superior Court* (2005) 130 Cal.App.4th 1550, 1557, fn. omitted (*Franklin Mint*).) In "moving under section 877.6 for a good faith settlement determination, the moving party must set forth the value of the consideration paid and an evidentiary basis for that valuation, and must demonstrate that the valuation 'was reached in a sufficiently adversarial manner to justify the presumption that a reasonable valuation was reached.' " (*Id.* at p. 1558.) "A nonsettling defendant may then challenge the settlement by 'attempt[ing] to prove that the parties' assigned value is too low and that a greater reduction in plaintiff's claims against the remaining defendants is actually warranted.' " (*Ibid.*) "A defendant seeking an offset against a money judgment has the burden of proving the offset." (*Conrad v. Ball Corp.* (1994) 24 Cal.App.4th 439, 444.)

In determining the amount of an offset, the trial court engages in an equitable undertaking (*Abbot Ford, Inc. v. Superior Court* (1989) 43 Cal.3d 858, 873-874), taking into account the goals of good faith settlements, i.e. "the equitable sharing of costs among the parties at fault and the encouragement of settlements . . . as well as another important public policy: ' "the maximization of recovery to the plaintiff for the amount of . . . injury to the extent that negligence or fault of others has contributed to it." [Citation.] Thus, while the nonsettling

22

defendant is entitled to a fair setoff, the injured plaintiff also has a right that the setoff not be excessive.'" (*Franklin Mint, supra,* 130 Cal.App.4th at pp. 1556–1557.) "The trial court's determination of the value of the consideration paid will be upheld on appeal if supported by substantial evidence." (*Id.* at p. 1558.)

   b.     *Application of Section 877*

   Harouche, Finton, and FCI moved for a good faith settlement determination, asserting that the settlement was worth $1,100,000, i.e. the amount of consideration Finton and FCI agreed to pay in installments for their dismissal from the litigation. In their opposition filed on February 21, 2017, Sisca and TWC did not argue that the $608,000 alleged in the Finton/FCI cross-complaint should be credited toward the value of the settlement. In fact, their argument that Finton should proportionately bear more liability for the damages than Sisca/TWC was largely premised on the concern that the offset would only be $1,100,000 of the potential $3,042,213.50 in damages possible at trial.

   It was not until June 27, 2018, Sisca and TWC argued in their objections to the trial court's proposed statement of decision that the offset should include the amount the cross-complaint's for $608,000. They explained that in FCI's cross complaint, FCI alleged Harouche owed $608,000, the amount outstanding on the final pay application associated with the construction contract. Sisca and TWC argued: "The outstanding amount of this final pay application and unbilled amounts as alleged in the Cross-Complaint and to which Harouche and Finton both testified at trial as being unpaid are costs avoided by Harouche and therefore the value of these amounts inures to the benefit of Harouche. Consequently, the value of the released FCI Cross Complaint should be considered part of the settlement amount 'stipulated by

23

the release.' The amount avoided is an additional $608,000.00[.] Therefore, the net monetary effect of the good faith settlement by FCI and Finton to Harouche is $1,708,000.00. It is from this amount that the Plaintiff's claims against Sisca must be reduced pursuant to Code [Civil Procedure section] 877, not the $1,100,000.00 in the Proposed Statement."

The court's ruling on whether it should offset the judgment by the settlement was primarily limited to the following language from its statement of decision: "The Court will not assess an offset at this time; however, the Court retains jurisdiction to award the Sisca Defendants an offset when and if the Finton Defendants make a payment to Harouche under the settlement agreement."

The first part of the sentence refers to an offset in general terms and could be interpreted to include the $608,000. But what follows—the court's statement that it will consider an offset if the "Finton Defendants make a payment" – appears only to refer to the periodic $18,000 payments FCI was to make under the settlement agreement and bankruptcy plan of reorganization.[13] In any event, the trial court did not expressly

---

[13] The $608,000 was part of the claim that FCI and Finton made against Harouche in its cross-complaint. In its statement of decision, the court stated: "A cross-complaint was filed by defendants for breach of contract and common count for goods and services rendered. Neither party addressed the cross-complaint in their closing arguments. The Court finds against cross complainant on the cross complaint." It is unclear whether the court's adjudication of the cross-complaint was intended to encompass a finding that there was no merit to the $608,000, and hence nothing additional to overset. Harouche asserts that Sisca and TWC were not entitled to an offset because "Harouche never sought the $608,000 at issue in FCI's cross-complaint as damages in his complaint, and the trial court never held the Sisca

24

find whether to offset the judgment by $608,000 or any other amount. Nor can we apply the doctrine of implied findings to conclude the trial court denied any offset because the issue was controverted.

"When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court either prior to entry of judgment . . . , it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (§ 634.) Given the procedural posture of the case and the equitable nature of the offset inquiry, we remand for the trial court to consider and rule on the $608,000 offset.

4.     ***Prejudgment Interest Must be Recalculated Based on the Modified Judgment***

The trial court awarded Harouche $990,486.45 in prejudgment interest, based on its total damages award of $1,962,837.72. We hold in part 1 that the trial court erred in calculating the fraudulent change order damages. Instead, the true damages for the inflated subcontracts was $362,982.26 ($250,324 for the first eight subcontracts and $112,658.26 for the solar contract). In part 2, we affirmed the trial court's award of $235,000 in damages for the "referral fee." Also, and unchallenged on appeal, we affirm the trial court's award of $205,011.46 in damages for the 1.5 percent kickback of all amounts Harouche paid FCI. Based on the foregoing, we modify the judgment to award Harouche $802,993.72 ($362,982.26 +

---

Defendants liable for such amounts." He misses the point. Sisca and TWC argue it is FCI's release of a valid $608,000 claim that Harouche allegedly owed FCI that constitutes an additional economic benefit to Harouche under the settlement agreement, and its value should be included in the offset.

25

$235,000 + $205,011.46) in damages.  (See *Behr, supra,* 193 Cal.App.4th at p. 533 ["When the evidence is sufficient to sustain some but not all alleged damages, we will reduce the judgment to the amount supported by the evidence."].)

We remand the matter for the trial court to modify the award of prejudgment interest based on the correct damages of $802,993.72.  (See *Wallis v. PHL Associates, Inc.* (2013) 220 Cal.App.4th 814, 817 [modification of the judgment "as to the jury verdict and remand for recalculation of prejudgment interest."].)

### *DISPOSITION*

The judgment is modified to reduce the damage award to Harouche to $802,993.72.  The matter is remanded to the trial court with directions to (1) recalculate the prejudgment interest on the $802,993.72 in damages; (2) rule on Sisca and TWC's claim of a $608,000 offset; and (3) prepare an amended judgment.  In all other respects the judgment is affirmed.  The parties shall bear their own costs.


RUBIN, P. J.

WE CONCUR:



BAKER, J.



KIM, J.



26