Filed 10/25/24

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CHRISTOPHER D. ALAFI et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> STANLEY N. COHEN, <br><br> Defendant and Appellant. | H050485 <br> (Santa Clara County <br> Super. Ct. No. 18CV333075) |

This dispute stems from a failed business venture between longtime friends, ultimately resulting in a $20 million judgment against defendant Stanley N. Cohen for negligent misrepresentation.

Cohen has been a professor at Stanford University School of Medicine since the 1960s. He is widely known for discovering recombinant DNA in the 1970s, which helped give rise to the field of biotechnology. In 2010, Cohen and a colleague discovered a genetic mutation they believed causes Huntington's disease. They soon sought a suitable drug to target the mutation, first identifying a compound called "HD106" that had been used in the 1970s for psoriasis, for which they hoped to obtain FDA approval to treat Huntington's disease.

For that purpose, they formed a company called Nuredis in 2016, together with Cohen's friend Moshe Alafi and his son, Chris, both wealthy biotechnology investors. The Alafis eventually invested $20 million in Nuredis in exchange for a 20 percent stake in the company.

In 2017, though, the FDA rejected Nuredis's initial request for approval to conduct human clinical trials for HD106, citing the drug's risk of blood clotting and death, and noting its prior removal from the market in the 1970s based on unacceptable toxicity levels. Although the FDA solicited additional information, Nuredis eventually abandoned its pursuit of HD106.

In August 2018, Chris Alafi—along with his investment company and family trust—sued Cohen and his colleague Dr. Tzu-Hoa Cheng for negligent misrepresentation and six related causes of action based on defendants' alleged failure to disclose to plaintiffs that HD106 had been withdrawn from the market by the FDA in the 1970s due to its unacceptable toxicity levels. After a bench trial, the trial court found in plaintiffs' favor on the negligent misrepresentation cause of action against Cohen only, declined to reach the other causes, and awarded $20 million in damages plus interest.

On appeal, Cohen argues that the negligent misrepresentation cause of action fails as a matter of law because (1) it requires an affirmative misrepresentation, rather than a mere omission, (2) plaintiffs did not rely on the alleged omission because they were put on notice of the toxicity risks but failed to make further inquiry, and (3) plaintiffs were not ignorant of the truth because Cohen had informed Moshe Alafi that HD106 was withdrawn from the market in the 1970s, and Moshe was an agent of plaintiffs.

Cohen also argues that the trial court committed prejudicial error by failing to issue a statement of decision upon his request.

We find that trial court's failure to issue the requested statement of decision was prejudicial error because it prevents this court from effectively conducting appellate review of the trial court's factual and legal findings. Accordingly, we do not reach Cohen's arguments on the merits, and we reverse and remand for the trial court to issue the statement of decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Cohen's research and discovery of genetic mutation

Cohen has been a professor of medicine and researcher at Stanford University since 1968. In 1973, he and a colleague began collaborating on what eventually resulted in the discovery of recombinant DNA. Cohen has described recombinant DNA as "a way to take genes from one organism and transplant them to another and propagate them in the organism."

The discovery has enabled researchers to study genes and produce products made by genes, which has been described as the genesis of modern biotechnology. That included, for instance, transplanting human genes into bacteria to create RNA and protein, which became the methodology for producing insulin and growth hormones, similar to the cloning used to make messenger RNA vaccines for treatment of COVID infections. Cohen and his colleague's discovery led to the licensing of roughly 475 patents assigned to Stanford University.

Following his discovery of recombinant DNA, Cohen continued his academic research at Stanford over the next several decades.

In 2010, Cohen began working with Cheng to research the genetic cause of Huntington's disease and to seek viable drugs for treatment or cures. Cheng—who is now senior vice president and a professor of biochemistry at the National Yang-Ming Chiao Tung University in Taiwan—had received his postdoctoral training studying under Cohen at Stanford from 2000 to 2003, after which the two remained in touch. In 2003, Cheng started his own lab in Taiwan, where he began conducting research into neurodegenerative diseases such as Huntington's disease.

Huntington's disease is a fatal neurodegenerative disorder that causes the progressive breakdown of nerve cells in the brain, spinal cord, and central nervous system, affecting the ability to reason, walk, and speak. The disease stems from a genetic defect or mutation in the human gene known as "huntingtin," or MHTT, in which a

person's DNA has excessive repeats of nucleotides that comprise part of the inner structure of DNA. It typically begins between age 30 and 40 and becomes fatal within 10 to 20 years. There is no known cure or treatment to delay progression.

Cheng soon discovered that targeting, or "knocking down," a particular protein known as "Spt4," or "Supt4h" in mammals, reduces the mutant huntingtin protein while still enabling healthy cell function. In 2010, Cheng shared this discovery with Cohen while visiting him in the United States, and the two soon began collaborating on further research. After additional study and experimentation, Cheng and Cohen published their results in 2012 in Cell magazine, a peer-reviewed scientific journal. They subsequently published two additional articles in 2015 and 2016, together with other co-authors, summarizing their continuing research on the subject, which included lab experiments using live cell cultures and mice.

### B. Selection of HD106

In 2013, Cheng and Cohen began searching for acceptable drug compounds to target the protein in humans. They soon identified one particular drug, which they labeled "HD106," as the most promising option because of its prior human experience. HD106 had previously been approved by the FDA in 1975 to treat psoriasis. At the time, it was used on more than 1,000 psoriasis patients under the drug names "azaribine" and "Triazure."

In 1976, however, the drug was ordered withdrawn from the market by the FDA due to unacceptably high toxicity levels and association with blood clots and death in some patients. Notwithstanding its removal from the market, certain patients were still authorized to use the drug under compassionate circumstances where they did not benefit from any other treatment of severe psoriasis.

In Cohen's view, HD106 offered an advantage because of the preclinical toxicology and safety testing it had undergone in connection with the prior FDA approval in the 1970s. Its history of safety testing, he believed, would accelerate the timeline for

4

obtaining approval to proceed to human clinical trials for use in treating Huntington's disease.

### C. Cohen's relationship with the Alafis and initial discussions regarding HD106

Cohen had been close friends with Moshe and Chris Alafi since the 1970s, after he and Moshe initially met as directors for a company called Cetus. Moshe was a sophisticated investor who owned early stakes in some of the biggest biotechnology companies, such as Amgen and Biogen. He founded Alafi Capital as a family investment company and served as a managing partner until 2015. Chris Alafi is also an experienced investor in biotechnology with a PhD in biochemistry from Oxford University. He has served as a managing partner at Alafi Capital since before 2000.

While Cohen and Cheng were conducting their research into Huntington's disease and HD106, Cohen would periodically share some of the information with Moshe Alafi. The nature of this information and the extent to which it was also shared with Chris Alafi, in particular the toxicity risks of HD106 and its full history with the FDA, form the crux of the dispute between the parties. Their competing testimony and evidence on this issue are summarized below as relevant.

### D. Formation and investment in Nuredis

Nuredis was created as a Delaware corporation in April 2016. Upon formation, Chris Alafi was named president, while Cohen and Cheng were named as the two directors. Ninety-eight percent of the initial shares were divided equally between Cheng and a trust Cohen had established, each investing $1,000.

In June 2016, Cohen and the Alafis executed a "term sheet" for stock financing of Nuredis, which contemplated a $20 million investment in the company by the Christopher D. Alafi Family Trust (Alafi trust) and Alafi Capital Company, LLC (Alafi Capital). The term sheet was signed by Cohen as director on behalf of Nuredis; by Moshe Alafi as managing partner of Alafi Capital; and by Chris Alafi as trustee of his

family trust, on behalf of the investors. The following month, Alafi Capital and the Alafi trust each invested $10 million in Nuredis, in exchange for a 10 percent stake in the company for each.

Chris Alafi signed the stock purchase agreement on behalf of Nuredis as president, on behalf of Alafi Capital as managing partner, and on behalf of the Alafi Trust as trustee.

The parties disagree as to who initially proposed forming the company and how the Alafis came to invest in Nuredis. Cohen testified that it was initially Moshe Alafi's idea to form a company to pursue drugs to address Huntington's disease, and that Alafi told him he wanted to be "the founding investor." He also testified that Moshe Alafi had proposed that he and Chris make the initial $20 million investment in the company in exchange for 20 percent ownership.

Chris Alafi argues on appeal that it was not his father's idea to start a company, noting Cheng's testimony that it had initially been Cheng's idea back in 2012. Moreover, he argues that Cohen induced and encouraged the Alafis to invest in Nuredis through his misrepresentations that form the basis of this lawsuit.

### E. Submission to FDA

In early 2017, Nuredis initiated the "Pre-Investigational New Drug Application" process, or "pre-IND," with the FDA, to obtain the requisite approval before HD106 could proceed to human clinical trials and, ultimately, the market. In May 2017, Nuredis provided the FDA with background and briefing materials on HD106 in advance of a pre-IND meeting. The materials stated, among other things, that "Huntington's disease (HD) is a fatal, inherited disorder that causes degeneration of brain cells in motor control regions and other areas of the brain. Manifestations of the disease, which normally progress from time of onset, include production of a brain-damaging protein, uncontrolled movements, abnormal body postures, and changes in behavior, emotion,

6

judgment, or cognition …. There is a high unmet need for treatment of this devastating disease, as there is currently no cure for HD and no disease-modifying therapies."

In addition, it explained that HD106 had been approved by the FDA in 1975 as an oral treatment for severe recalcitrant psoriasis. Further, "[d]uring clinical use, several instances of arterial thromboembolic episodes were observed, leading to withdrawal of the approval in 1976. Subsequent investigations have shown that psoriasis itself is associated with an increased risk of thromboembolism in patients with severe psoriasis [citation], the exact patient population azaribine was intended to treat. Additionally, evidence obtained later … indicated an association between thrombosis and vitamin B6 deficiency, which can result from depletion of pyridoxal phosphate through its reaction with a metabolite of azauracil or azauridine. The data from further investigations in animals and humans suggested that the combined therapy of azaribine and [vitamin B6] would eliminate the occurrence of thromboses associated with azaribine. [¶] As described herein, Nuredis is proposing to conduct a clinical trial in patients with HD in which NU106 will be co-administrated with vitamin B6."

Nuredis explained that it was seeking feedback from the FDA regarding "the adequacy of the chemistry, manufacturing and controls data to support the proposed clinical study, [¶] the adequacy of the existing nonclinical data and human data to support the proposed clinical study, [¶] the design of the proposed Phase l clinical study, [and] [¶] endpoints for future clinical investigations."

The FDA responded in June and August 2017. It expressed concerns regarding the safety of HD106, in particular the thromboembolic events, or blood clotting. The agency stated that, because HD106 had been "withdrawn for reasons of safety and is no longer a listed drug, before you continue with your nonclinical program, we request that you (a) specify the study or studies or other information evidenced in the last FDA approved labeling, SBA, or other documents concerning Triazure that you believe are appropriate for your nonclinical program; (b) explain how such study/studies or

7

information will inform your nonclinical program; and (c) provide a scientific justification detailing the relevance of such study / studies / information to the development of your proposed product." Further, it stated that the risk associated with human use of HD106 was "unmonitorable, and irreversible, with potential for fatal outcomes." The FDA solicited additional information from Nuredis on various topics regarding its submission.

### F. Reaction to FDA response

After the FDA's initial response in June 2017, Nuredis considered how to proceed. It held a meeting on June 22, 2017, noting in the minutes that, "[t]he critical point in the [FDA] response is, 'The risk (thromboembolic adverse reactions) is considered unmonitorable, and irreversible, with potential for fatal outcomes.' [¶] There is no simple or easy way, if there is a way at all, to deal with this." In October 2017, the board of directors met to consider similar questions and assess whether to proceed with HD106. Ultimately, Nuredis did not submit a further response to the FDA.

In April 2018, the board of directors met to review the development status of HD106. Julie Smith, CEO of Nuredis at the time, recommended to the board that the company discontinue the HD106 program. The board agreed.

### G. Complaint

Chris Alafi, Alafi Capital, and the Alafi trust (plaintiffs) filed the initial complaint in this action against Cohen and Cheng in August 2018. They filed the operative second amended complaint in May 2019 (SAC). The SAC stated causes of action for fraudulent inducement, fraudulent concealment, securities fraud, unfair competition, negligent misrepresentation, breach of fiduciary duty, and reformation. It alleged, among other things: "When Cohen told Moshe and his son Chris that he and another scientist from Taiwan, Defendant Cheng, were developing a cure for Huntington's Disease, and that the drug compound was so far along it was ready to move into clinical trials, the Alafis reasonably believed him. They had no idea that this 'friend' of many years was about to

8

defraud them by telling them a string of falsehoods designed to induce the Alafis to invest $20 million — the sole cash investment ever to be made — in Defendants' company, leaving the Alafis with a minority interest in an entity controlled by Defendants and used by them as a financial grab bag of lucrative salaries, fees, and perks that they took for themselves, and, in the case of Defendant Cohen, funneled to his secret paramour in an amount far in excess of any services she actually provided to the company."

Further, the SAC alleged that "at the time that Defendants were inducing the Alafis to make their $20 million investment in Nuredis, they were fully aware of the fact that HD 106, the molecule that purportedly was going to cure HD by attacking the SUPT4H/5H factor, had in fact been used a number of decades earlier to treat a different disease, psoriasis, and that excessive toxicity problems with the molecule, resulting in serious and even fatal thromboembolic cardiac conditions, had caused the molecule to be pulled from the market. Defendants failed to disclose to the Alafis the seriousness of these toxicity problems associated with the molecule or the fact that in light of these dangerous toxicity issues the FDA would require both extensive toxicity studies to be conducted and a demonstration of substantial preclinical proof of efficacy of the molecule in significantly reducing toxic protein aggregation before ever exposing human subjects in clinical studies to the risks associated with the use of such a molecular-based treatment." In addition, "[d]efendants knew that had they not omitted disclosure of this crucial information, the Alafis would not have caused Plaintiffs to make the $20 million investment in Nuredis, as the company would not have been able to sustain such a valuation in light of these facts."

The SAC sought $20 million in damages, plus interest.

Cohen and Cheng answered and issued a general denial.

9

### H. Bench trial and subsequent order

A two-week bench trial was held in January and February 2022. After the close of evidence, the parties submitted post-trial briefs and proposed findings of fact, and counsel presented closing arguments on March 28, 2022. The trial court took the matter under submission.

On June 24, 2022, the trial court issued its "order after trial on submitted matter" (order). The court found that Cohen "was negligent in his representations to Plaintiffs and that he made material omissions to Plaintiffs in the solicitation of investment capital for Nuredis." It also found that "expert testimony supports Plaintiffs' position that had the compound's history been known at the time of Plaintiffs' due diligence, the risk of investment would have been intolerably high and Plaintiffs would not have invested twenty million dollars."

The court added that, although Cohen "may have shared material facts" with Moshe Alafi, he did not credibly testify that he had shared material facts with Chris Alafi prior to investment. Cohen's testimony, the court found, "at times was inconsistent, confusing, and unreliable." The court noted, though, that it believed Cohen and Cheng "started Nuredis with good intentions and with viable, peer reviewed research," and that they did not intend to make misrepresentations or defraud plaintiffs.

Accordingly, the court awarded $20 million to plaintiffs against Cohen, "as a return on Plaintiffs' investment in [Nuredis]." The court awarded nothing to plaintiffs against Cheng, finding that they had failed to meet their burden of proof as to him.

Because the trial court held that plaintiffs had recovered the entirety of their claim under the negligent misrepresentation cause of action, it declined to reach the other causes of action.

### I. Request for statement of decision and entry of judgment

Over the course of the next three months, the parties argued over defendants' requested statement of decision and post-trial motions, and the trial court's entry of

10

judgment. In short, as the following summary demonstrates, although defendants timely requested a statement of decision, the trial court entered judgment without ever issuing one.

In the order, the trial court had directed plaintiffs "to prepare judgment in accordance with this order." Six days later, on June 30, 2022, plaintiffs served a proposed judgment on defendants. That same day, defendants filed a document entitled "Defendants' Objection to Entry of Final Judgment," in which they noted that plaintiffs had just served their proposed final judgment, and they objected "to any entry of judgment at this time as premature," citing California Rules of Court, rule 3.1590.[1]

On July 5, 2022, plaintiffs submitted their proposed final judgment to the court. The trial court signed and entered the judgment that same day (judgment). The judgment incorporated the order by reference and also directed Cohen to pay plaintiffs $20 million, "plus pre-judgment interest of 7% per annum running from the July 16, 2016, date of investment, plus post-judgment interest at the statutory rate."

Also on that same day, just minutes after the judgment was entered, Cohen filed a request for statement of decision.[2] Cohen made the request pursuant to rule 3.1590(a) and (b), on the basis that the trial court's order was a "tentative decision and is not binding." Cohen requested that the court issue "a written statement of decision setting forth the factual and legal basis for its decision as to each of the principal controverted issues…." He then enumerated 12 distinct issues for the trial court to address, which we discuss in detail below.

On July 8, 2022, plaintiffs filed and served notice of entry of judgment. That same day, they also filed a response to Cohen's request for statement of decision. They argued

---

[1] California rules of court, rule 3.1590, generally sets forth procedures for tentative decisions, statements of decision, and entry of judgment in trials regarding questions of fact determined by the trial court.

[2] Cohen's attorney had also verbally requested a statement of decision prior to the close of trial.

that the trial court lacked jurisdiction to "entertain further statement of decision proceedings after entry of judgment," and that the request was moot because the trial court's order operated as a statement of decision in response to defense counsel's request during trial because it addressed all the issues in Cohen's request "that were necessary to explain the factual and legal basis for the Court's ruling."

On July 11, 2022, defendants filed objections to plaintiffs' proposed final judgment, notwithstanding the fact that the judgment itself had already been entered. They argued that, "as noted in Defendants' June 30, 2022 Objection to Entry of Final Judgment, entry of final judgment was premature pursuant to at least California Rule of Court 3.1590, including because final judgment was entered without providing any opportunity to object."

On July 15, Cohen then submitted objections to the trial court's order, which had been entered on June 24. He argued again that the order constituted a "non-binding tentative decision because it was captioned 'Order After Trial on Submitted Matter' and did not state that it was 'the court's proposed statement of decision.' Cal. R. Ct. 3.1590(c)(1)." Nevertheless, he filed the objections "out of an abundance of caution" pursuant to Code of Civil Procedure section 634 and California Rule of Court 3.1590(g), as if the order were a statement of decision, in which case, he argued, the objections were timely as filed within 15 days of service of the proposed final judgment.

Shortly thereafter, on July 20, 2022, Cohen filed a notice of intent to move for a new trial and vacate the judgment, pursuant to Code of Civil Procedure sections 657 and 663, respectively. He asserted in the notice that the trial court's jurisdiction to rule on the motion would expire on September 18, 2022, assuming that notice of entry of judgment

12

was properly served on July 5, 2022, the day the court entered it.[3] Notwithstanding that, the trial court set the hearing date for the motion for October 5, 2022.

Cohen then filed the motion itself on August 1, 2022.[4]

On September 22, 2022, plaintiffs moved to vacate the hearing on Cohen's motion, on the ground that the trial court lacked jurisdiction to consider it after September 18, 2022, when Cohen's motion had been deemed denied by operation of law, pursuant to Code of Civil Procedure, sections 660 and 663a.

On September 28, 2022, the parties appeared in court for an "informal attorney conference" to discuss what had transpired following issuance of the order on June 24, 2022, and what should be done in light of the court's apparent loss of jurisdiction. The trial court expressly acknowledged that two clerical errors had been made by the court: premature entry of judgment without responding to the request for a statement of decision, and calendaring the hearing for Cohen's post-trial motions for a date after the trial court would lose jurisdiction. The court recognized that it lacked jurisdiction to hear Cohen's motion, which "leads the court to conclude that a premature judgment has been issued [sic] and that the defendant has been denied the opportunity to have post-trial motions heard." It added: "I suspect what this means is that we'll see you all again somewhere down the path after the appeal has been determined."

---

[3] Code of Civil Procedure section 660, subdivision (c) provides in part: "[T]he power of the court to rule on a motion for a new trial shall expire 75 days after the mailing of notice of entry of judgment by the clerk of the court pursuant to Section 664.5 or 75 days after service on the moving party by any party of written notice of entry of judgment, whichever is earlier, or if that notice has not been given, 75 days after the filing of the first notice of intention to move for a new trial. If the motion is not determined within the 75-day period, or within that period as extended, the effect shall be a denial of the motion without further order of the court."

[4] The file-stamp on the motion is dated August 18, 2022, although the motion itself is signed and dated August 1, 2022. Plaintiffs filed their opposition to the motion on August 11, 2022, and recited in their proposed order that Cohen had filed his motion on August 1. We assume for purposes of this appeal that the motion was filed on August 1, 2022.

*J. Appeal*

Cohen timely appealed. (Cal. Rules of Court, rule 8.108(b)(1)(B).)

## II. DISCUSSION

Cohen first argues that the judgment must be reversed because plaintiffs' negligent misrepresentation claim fails as a matter of law for three independent reasons: (1) Cohen's supposed *omissions* of information—as opposed to affirmative misrepresentations—cannot support a claim for negligent misrepresentation; (2) plaintiffs did not justifiably rely on any alleged misrepresentations; and (3) plaintiffs failed to prove they were ignorant of the truth, because Moshe Alafi was plaintiffs' agent and he knew the allegedly omitted material facts.

Second, Cohen argues that the judgment must be vacated because the trial court's failure to issue the requested statement of decision was prejudicial error. According to Cohen, because the trial court did not make findings on several controverted issues that could have affected the ultimate finding of liability, it effectively precludes appellate review and constitutes prejudicial error.

As we explain below, we conclude that the trial court's error in failing to issue the requested statement of decision was prejudicial because it precludes this court from effectively performing a review of the principal controverted issues, and assessing whether substantial evidence supports the trial court's findings. For that reason, we do not address Cohen's threshold argument on the merits.

### A. Applicable law and standard of review

Code of Civil Procedure section 632 provides that " 'upon the trial of a question of fact by the court,' the court 'shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial.' " (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1102 (*F.P.*); Code Civ. Proc., § 632.) A statement of decision need not respond to "every point raised by a party or make an express finding of fact on each contested factual

14

matter; it need only dispose of all basic issues and fairly disclose the court's determination as to ultimate facts and material issues in the case." (*Duarte Nursery, Inc. v. California Grape Rootstock Improvement Commission* (2015) 239 Cal.App.4th 1000, 1012.)

"If a party timely requests a statement of decision, a proposed statement of decision and judgment must be prepared and served on all parties by either the court or a party the court designates." (*F.P., supra*, 3 Cal.5th at p. 1116, citing Cal. Rules of Court, rule 3.1590(f).) The request for a statement of decision must be made within 10 days after announcement or service of the tentative decision, whichever is later. (Code Civ. Proc., § 632; Cal. Rules of Court, rule 3.1590(d).)

The statement of decision serves multiple functions. It enables a trial court to review its intended decision and to make "corrections, additions, or deletions it deems necessary or appropriate." (*Miramar Hotel Corp. v. Frank B. Hall & Co.* (1985) 163 Cal.App.3d 1126, 1129.) In turn, that allows a reviewing court to determine what law the trial court employed. (*Id.*, citing *Roccaforte v. City of San Diego* (1979) 89 Cal.App.3d 877, 887.) A statement of decision thus allows a court to place its view of the facts and law into the record. (*In re Marriage of S.* (1985) 171 Cal.App.3d 738 (*Marriage of S.*); see also, *Whittington v. McKinney* (1991) 234 Cal.App.3d 123, 126–127 (*Whittington*) [" 'to the court it gives an opportunity to place upon the record, in definite written form, its view of the facts and the law of the case, and *to make the case easily reviewable on appeal* by exhibiting the exact grounds upon which judgment rests' "].)

At the same time, " '[t]o the parties, *it furnishes the means, in many instances, of having their cause reviewed without great expense.* It also furnishes to the losing party a basis of his motion for a new trial; he is entitled to know the precise facts found by the court before proceeding with his motion for new trial, in order that he may be able to point out with precision the errors of the court in matters either of fact or law. [Citation.]' " (*Whittington, supra*, 234 Cal.App.3d at p. 127.) "Unless the court complies

15

with its obligation under section 632, the losing party will be deprived of its right to know the precise facts found by the court and the exact grounds upon which the judgment rests." (*Ibid.*; see also, *Gordon v. Wolfe* (1986) 179 Cal.App.3d 162, 168 (*Wolfe*) ["without a statement of decision, the judgment is effectively insulated from review by the substantial evidence rule"].) The statement of decision provides a reviewing court "with the trial court's reasoning on disputed issues and 'is our touchstone to determine whether or not the trial court's decision is supported by the facts and the law.' [Citation.]" (*In re Marriage of Starr* (2010) 189 Cal.App.4th 277, 287 (*Marriage of Starr*).)

A trial court's failure to issue a requested statement of decision is subject to harmless error analysis. (*F.P., supra,* 3 Cal.5th 1099; see also Cal. Const., art. VI, § 13 ["No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."].)

Although such failure is not prejudicial per se, "the more issues specified in a request for a statement of decision and left unaddressed by a court's failure to issue one, the 'more difficult, as a practical matter, [it may be] to establish harmlessness.' " (*F.P., supra,* at p. 1116, quoting *People v. Mil* (2012) 53 Cal.4th 400, 412.) Thus, such a failure "may at times require reversal in order for the appellate court to effectively perform a review of the material issues." (*F.P., supra,* at p. 1116.)

Reversible error requires a demonstration of prejudice "arising from the reasonable probability the party 'would have obtained a better outcome' in the absence of the error." (*Fisher v. State Personnel Bd.* (2018) 25 Cal.App.5th 1, 20 (*Fisher*).) An appellant has the burden of affirmatively demonstrating prejudicial error. (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069.)

### B. Analysis

#### 1. The trial court erred by failing to issue a statement of decision following Cohen's timely request

As noted above, a trial court must issue a statement of decision upon the timely request of any party appearing at the trial—that is, within 10 days of announcement of service of the tentative decision. (Code Civ. Proc., § 632; Cal. Rules of Court, rule 3.1590(d).) Here, Cohen submitted his request for a statement of decision on July 5, 2022, asserting that the trial court's June 24, 2022, order was a "tentative decision" pursuant to rule of court 3.1590(a) and (b), thereby triggering the 10-day period in rule 3.1590(d).

Plaintiffs do not dispute Cohen's assertion that he timely submitted the request for a statement of decision. The trial court also stated at the informal attorney conference on September 28, 2022, that Cohen had submitted a timely request: "And it has come to my attention that a statement of decision request was timely made by the defendants, but that the entry of judgment on the order after taking the matter on—under submission was filed and served before the request for a statement of decision was processed and put into the court's file." We consider Cohen's request to have been timely. (Code of Civ. Proc., § 12a, subd. (a).) The trial court's failure to issue the requested statement of decision as required by Code of Civil Procedure section 632 was therefore error.

Plaintiffs do not dispute that it was error. Instead, they argue that Cohen waived his argument regarding the statement of decision through lack of diligence. Specifically, they contend Cohen failed to ensure that his motion for new trial and to vacate the judgment was heard before the trial court's jurisdiction expired. According to plaintiffs, Cohen knew the hearing was scheduled after the trial court would lose jurisdiction, but failed to take any action to expedite the hearing.

Plaintiffs cite *Dakota Payphone, LLC v. Alcaraz* (2011) 192 Cal.App.4th 493 (*Dakota Payphone*), for the proposition that it is the duty of the moving party to ensure

17

his motion for a new trial is set for a hearing within the statutory period, and that when a party "*is guilty of a lack of a diligence in the prosecution and presentation of the motion, he cannot complain of the court's inadvertence.*"  The case and the proposition are inapposite here, though.  In *Dakota Payphone,* the trial court had continued the hearing on a motion for new trial beyond the jurisdictional deadline.  The court of appeal held that the trial court had lacked jurisdiction to grant the motion, which had been deemed denied by operation of law after the deadline had passed.  (*Id*. at pp. 500–501.)  The appellate court also rejected the moving party's argument that he had been disadvantaged by the trial court's continuance of the hearing date, noting his lack of diligence in having his motion heard within the jurisdiction period.  (*Ibid*.)

But the case did not deal with a statement of decision at all, and the court made no finding or ruling regarding waiver in that context.  Here, Cohen is not appealing the trial court's failure to hear his motion on time, but instead is challenging its failure to issue the requested statement of decision as required by law.  Cohen did not waive that challenge.

Lastly, in their respondents brief, plaintiffs assert that the trial court's order constituted the statement of decision Cohen had requested during trial.  However, they make no actual argument in support of that statement, and cite no case law holding that an order of that type can constitute a statement of decision.  We consider the point waived.  (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [when an appellant fails to raise a point, or raises it but fails to support it with argument and citations, courts may treat it as waived].)

## 2. *The error was prejudicial*

### *(a) Prejudice standard*

In 2017, the California Supreme Court held in *F.P.* that the failure to issue a requested statement of decision is not reversible per se, but instead is subject to harmless error analysis.  (*F.P., supra*, 3 Cal.5th 1099.)  In that case the plaintiff sued her cousin for acts of sexual battery.  (*Id*. at p. 1103.)  After trial, the court issued a tentative decision in

18

the plaintiff's favor and instructed her to submit a proposed judgment. (*Ibid*.) The defendant timely filed a request for a statement of decision asking the trial court to set forth the basis upon which it was awarding certain categories of damages. (*Ibid*.) The plaintiff then submitted a proposed judgment, which the court soon entered, despite not issuing the requested statement of decision. (*Id*. at pp. 1103–1104.) On appeal, the defendant argued that the failure to issue the requested statement of decision was reversible per se, and that, without the statement, "it was unknown whether the trial court had apportioned general damages as the law required." (*Id*. at p. 1104.)

The California Supreme Court held that the failure to issue a requested statement of decision is subject to harmless error analysis pursuant to Article VI, section 13 of the California Constitution. (*F.P., supra,* 3 Cal.5th at pp. 1104, 1108, 1115–1116.) The court "express[ed] no opinion regarding the Court of Appeal's conclusion that the error here was, in fact, harmless." (*Id*. at p. 1104, fn. 2.)

Although the court did not conduct harmless error analysis in that case, it did acknowledge that "in a particular case a trial court's failure to issue a requested statement of decision may amount to a structural defect in the trial mechanism that defies evaluation for harmlessness …." (*F.P., supra*, 3 Cal.5th at p. 1109.) In addition, "the more issues specified in a request for a statement of decision and left unaddressed by a court's failure to issue one, the 'more difficult, as a practical matter, [it may be] to establish harmlessness.' " (*F.P.*, *supra,* at p. 1116, quoting *People v. Mil* (2012) 53 Cal.4th 400, 412.) Consequently, the failure by a trial court to issue a requested statement of decision "may effectively shield the trial court's judgment from adequate appellate review." (*F.P., supra,* at p. 1116, citing *Wolfe, supra,* 179 Cal.App.3d at pp. 167–168 [absent a statement of decision, court was "unable to review the sufficiency of the [lump sum damages] award properly by examining its various components in light of the evidentiary support for each of them"].)

19

The California Supreme Court agreed with the plaintiff that " 'a trial court's failure to issue a statement of decision *may at times* require reversal in order for the appellate court to effectively perform a review of the material issues.' " (*F.P.*, *supra,* 3 Cal.5th at p. 1116, italics added.)  Notwithstanding those principles, though, the court reiterated that "the possibility of causing prejudice even 'in many cases ... does not ... justify the judicial adoption of a state-law rule that automatically and monolithically treats *all* [failures to issue a requested statement of decision] as requiring reversal.' " (*Id.* at p. 1116, quoting *People v. Cahill* (1993) 5 Cal.4th 478, 503.)

As we have stated, a statement of decision must explain the factual and legal basis for its decision as to each of the principal controverted issues at trial.  (Code Civ. Proc., 632; *F.P., supra,* 3 Cal.5th at pp. 1102, 1105, 1115.)  One of its central purposes is to provide the reviewing court with the trial court's reasoning on disputed issues, thereby constituting the reviewing court's "touchstone" to assess whether the trial court's decision is supported by the facts and the law.  (*Marriage of Starr*, *supra,* 189 Cal.App.4th at p. 287.)

Applying these standards to assess prejudice in this context, we first identify the principal controverted issues at trial, then determine the extent to which the trial court explained the factual and legal basis of its findings regarding those issues, and finally consider whether that record enables this court to conduct adequate appellate review.

### (b) *Principal controverted issues*

The elements of a negligent misrepresentation claim are:  "(1) a misrepresentation of a past or existing material fact, (2) made without reasonable ground for believing it to be true, (3) made with the intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage."  (*Ragland v. U.S. National Bank Association* (2012) 209 Cal.App.4th 182, 196, citing *Wells Fargo Bank, N.A. v. FSI, Financial Solutions, Inc.* (2011) 196 Cal.App.4th 1559, 1573.)

Here, the parties disputed these elements, as well as multiple specific issues within each element, as reflected in Cohen's request for a statement of decision, the parties' pre-trial and post-trial briefs, proposed findings of fact, the evidence presented at trial, and counsel's closing arguments.

Cohen enumerated 12 distinct principal controverted issues for which he requested the trial court to set forth the factual and legal basis of its decision: (1) what misrepresentations or omissions Cohen made to plaintiffs or their agents in the solicitation of investment capital for Nuredis; (2) whether each misrepresentation or omission found by the trial court concerned past or existing material facts; (3) whether Cohen had reasonable grounds for believing each misrepresentation or omission found by the court was true; (4) whether Cohen intended for plaintiffs or their agents to rely on each misrepresentation or omission; (5) whether Cohen intended to misrepresent anything to plaintiffs or their agents in connection with plaintiffs' investment; (6) whether plaintiffs knew prior to their investment that HD106 had been previously approved by the FDA for the treatment of psoriasis, that it had some level of toxicity in patients, and that FDA approval was not guaranteed; (7) whether plaintiffs or their agents relied on each misrepresentation or omission found by the court; (8) whether any such reliance was reasonable, particularly in light of Chris Alafi's active participation in Nuredis in the months leading up to plaintiffs' investment, other information shared by Cohen, the recommendation of plaintiffs' advisors that they not invest in Nuredis, and relevant sections of the stock purchase agreement; (9) whether plaintiffs or their agents' reliance on each misrepresentation or omission found by the court was a substantial factor in causing plaintiffs' harm; (10) whether the 2017 recapitalization of Nuredis, under which plaintiffs gave up their preferred shares in exchange for greater ownership of common stock, shows that they did not rely on any misrepresentation or omission or that they were not a substantial factor in causing plaintiffs' harm; (11) whether Moshe Alafi was plaintiffs' actual or ostensible agent in connection with plaintiffs' investment; and (12)

21

what material facts allegedly not known by Chris Alafi were known by Moshe Alafi prior to plaintiffs' investment.

The record confirms that many of these issues were among the principal controverted issues at trial. For instance, plaintiffs argued in their pre-trial brief that the evidence would show Cohen had misrepresented that, because HD106 had previously been approved by the FDA to treat psoriasis, it "would be in a position to skip the usual time-consuming and expensive pre-clinical toxicology and related safety testing required to begin clinical testing on humans." They argued that Cohen falsely represented defendants had discovered a target to attack Huntington's disease, but failed to disclose that a leading non-profit research organization working on a cure for the disease "had spent significant sums of money and used an independent lab in an attempt to validate Defendants' purported discovery, but was unable to do so and told this information to Defendants well before Plaintiffs' investment." In addition, plaintiffs claimed Cohen had failed to disclose that HD106 was actually Azaribine and that the FDA had withdrawn its approval for the drug in 1976 based "an unacceptably high rate of thromboembolic events ('TEs') that resulted in loss of limbs and death." The evidence would show, they argued, that defendants "deliberately failed to disclose this crucial information despite knowing that safety was key to any FDA decision whether to allow human clinical testing to proceed."

Cohen disputed these factual assertions in his pre-trial brief, arguing that the evidence at trial would show he had disclosed the risks and history of HD106 to the Alafis, who knew that moving to human clinical trials was not a certainty. He contended that the Alafis conducted extensive due diligence before their investment, and he had provided them with information about his research, "making clear that, while he was excited about HD106's prospects, they were only prospects."

He argued that he had provided the Alafis with a business strategy memo in April 2016, in which he addressed the toxicity concerns plaintiffs claim he hid from them,

22

noting that HD106's toxicity was suboptimal and that it had "not been determined whether beneficial effects occur in [nucleotide repeat disease patients] at drug levels that are known to yield acceptable toxicity.' " Cohen claimed Chris Alafi had admitted that he had known, before investing, that it was " 'an open issue' " whether HD106's toxicity would prevent it from being administered in safe doses, that no one knew what the FDA would say about the drug, and that its toxicity was " 'suboptimal *for a skin disease*.' "

And, prior to plaintiffs investing in Nuredis, Cohen claimed he had discussed HD106, including the science, its history, toxicity, and future prospects "with numerous other individuals and entities just as he had with the Alafis." During the first year of Nuredis's operation, he claimed, the company discussed these topics at meetings as well, and the Alafis received documents which discussed HD106's history and its prior removal from the market.

The parties' post-trial briefs confirmed that these remained among the principal controverted issues following the evidence introduced at trial. Plaintiffs argued defendants had failed to disclose that HD106 had been withdrawn from the market "and subjected to a humiliating hearing before Congress, due to fatal thromboembolic events." They claimed Chris Alafi never would have invested in Nuredis if he had known those facts.

In their post-trial brief, plaintiffs identified five distinct categories of misrepresentations or omissions of material fact by Cohen: (1) claiming that HD106 could get directly into clinical trials, but omitting its past history and human experience, including 14 specifically enumerated material factual omissions by Cohen; (2) HD106's neurotoxicity, or damage to the brain and central nervous system caused by exposure to toxic substances; (3) the pharmacokinetic properties of HD106 and its ability to penetrate the blood brain barrier and accumulate significantly in the brain; and (5) failure to disclose pre-investment interactions with a non-profit Huntington's disease organization,

23

which had expressed concerns about Cohen and Cheng's scientific theory that targeting the Spt4 protein reduces the mutant huntingtin protein.

Plaintiffs also argued that all the other elements of negligent misrepresentation had been established, including that: Cohen had no objectively reasonable grounds for believing his representations were true; he knew his decades-long personal relationship with the Alafi family and his scientific standing would ensure that plaintiffs "would put great trust in his representations and forestall any notion that he might be withholding critical information"; Chris Alafi had justifiably relied on the representations; and, had the omitted information not been withheld, plaintiffs would not have invested.

Cohen, meanwhile, argued in his post-trial brief that the evidence showed he had told plaintiffs about HD106's toxicity history, "including that it might prevent the drug from being administered in effective doses, and indeed provided them with two draft timelines that showed multiple quarters of the preclinical toxicology studies that Plaintiffs falsely claim Dr. Cohen predicted they could skip." Specifically, he argued that: (1) he did not misrepresent anything regarding the non-profit Huntington's disease organization, which in fact provided data entirely consistent with Cohen and Cheng's conclusions; (2) not only did he not hide HD106's history from plaintiffs, but he instead repeatedly discussed its toxicity risks and concerns with Moshe Alafi, who was an agent of Chris Alafi, and the Alafis knew about HD106's risks before investing, including that it might not be able to get directly into clinical trials; and (3) he had made no representations to plaintiffs about whether HD106 passes through the blood brain barrier in humans.

In sum, the principal controverted issues at trial were the elements of plaintiffs' negligent misrepresentation claim, in particular whether Cohen made each of the numerous alleged misrepresentations or omissions of material facts, whether he made them without a reasonable ground for believing them to be true and with the intent to

24

induce plaintiffs' reliance on them, and whether plaintiffs in fact justifiably relied on them.

### (c) Issues unaddressed in the trial court's judgment

In certain circumstances, even without a statement of decision, a judgment may nevertheless contain a satisfactory explanation of the trial court's reasoning. (See, e.g., *In re Marriage of Fingert* (1990) 221 Cal.App.3d 1575, 1580; *In re Marriage of Seaman & Menjou* (1991) 1 Cal.App.4th 1489, 1494, fn. 3 [where judgment sets forth reasons for decision, absence of statement of decision does not hamper appellate review].)

Here, the judgment incorporated the trial court's order in full. As summarized above, the order included some factual and legal findings on some controverted issues. For instance, it found that Cohen was "negligent in his representations to Plaintiffs and that he made material omissions to Plaintiffs in the solicitation of investment capital for Nuredis." It also found that plaintiffs knew HD106 had "some level of toxicity to patients and that FDA approval for Nuredis was not guaranteed," and that plaintiffs had "claimed they did not know" HD106 had been withdrawn from the market in the 1970s due to potentially deadly side effects. Further, it found that Cohen did know about the history of HD106 and "shared that information specifically and in written form with others prior to Plaintiffs' investment."

The court found that trial testimony supported plaintiffs' position that, had they known the history of HD106 when they conducted their due diligence, they would not have invested $20 million because the risk would have been intolerably high. In addition, although Cohen "may have shared material facts with Moshe Alafi, [he] did not credibly testify that material facts had been shared with [Chris Alafi] prior to investment." The court added that Cohen's testimony "at times was inconsistent, confusing, and unreliable."

25

Finally, the court found that it was "persuaded" that Cohen and Cheng had started Nuredis with good intentions and viable, peer-reviewed research, and the court found no intentional misrepresentation or intent to defraud.

Despite these findings, many principal controverted issues were left unaddressed. Most notably, the trial court did not specify *which* alleged misrepresentations or omissions Cohen made in the solicitation of investment capital. As the overview of the parties' pre-trial and post-trial briefs demonstrates, there were numerous alleged misrepresentations and omissions which the parties disputed throughout the trial. Cohen expressly requested that the statement of decision specify *which* misrepresentations or omissions the trial court found. In addition, nearly every subsequent question enumerated in his request for statement of decision was tethered to, and predicated on, knowing precisely which specific misrepresentations or omissions the trial court found. For instance, Cohen asked the trial court to specify whether each misrepresentation or omission concerned past or existing material facts, whether Cohen had reasonable grounds for believing each misrepresentation or omission, whether Cohen intended for plaintiffs to rely on each misrepresentation or omission, whether plaintiffs or their agents relied on each misrepresentation or omission, and whether plaintiffs' reliance on each misrepresentation or omission was a substantial factor in causing plaintiffs' harm.

As Cohen argues on appeal, the trial court also failed to make findings as to other required elements of plaintiffs' negligent misrepresentation claim. The order and judgment made no finding as to whether Cohen had a reasonable ground for believing any particular misrepresentation was true when he made it. Nor did the trial court determine whether Cohen intended plaintiffs to rely on any particular misrepresentation or omission, or whether plaintiffs reasonably relied on them.

Plaintiffs argue on appeal that the trial court did make a finding regarding Cohen's "half-truths" about HD106, finding that he " 'did know about the history of the compound and shared that information specifically and in written form with others prior

26

to Plaintiffs' investment' but neglected to share it when communicating with Plaintiffs pre-investment about the advantages of HD106." However, the trial court made no finding regarding any "half-truth," nor any finding regarding whether Cohen had a reasonable belief as to whichever misrepresentations or omissions the trial court determined he made.

Plaintiffs also argue that this finding is essentially implied because Cohen knew "the full story" about HD106 and shared it with others but not plaintiffs, so "by definition he had no reasonable grounds for believing that the half-truths he told Plaintiffs to solicit their investment capital were true when made." However, because Cohen requested a statement of decision and brought this controverted issue to the trial court's attention, we do not infer any findings in favor of the prevailing party on that issue. (*Ruiz v. County of San Diego* (2020) 47 Cal.App.5th 504, 521, fn. 11; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134; Code Civ. Proc., § 634.)

In sum, the trial court failed to address numerous principal controverted issues Cohen specified in his request for decision.

### (d) The resulting inability to perform effective appellate review

The trial court's failure to address those controverted issues precludes effective review by this court. (*F.P.*, *supra*, 3 Cal.5th at p. 1116 [failure to issue statement of decision may "effectively shield the trial court's judgment from adequate appellate review"].) As the California Supreme Court stated in *F.P.*, "the more issues specified in a request for a statement of decision and left unaddressed by a court's failure to issue one, the 'more difficult, as a practical matter, [it may be] to establish harmlessness.' " (*Ibid*.)

Here, the trial court's failure to address the numerous controverted issues summarized above precludes this court from reviewing the evidence in the record to determine whether it supports the trial court's findings chiefly because we do not know what those findings were. At the same time, that failure deprives Cohen of his "right to

27

know the precise facts found by the court and the exact grounds upon which the judgment rests." (*Whittington*, *supra*, 234 Cal.App.3d at p. 127; see also, *Wolfe, supra,* 179 Cal.App.3d at p. 168 ["without a statement of decision, the judgment is effectively insulated from review by the substantial evidence rule"].) Because the trial court did not specify the precise facts and grounds upon which the judgment rests with respect to those principal controverted issues, Cohen cannot effectively challenge them. He cannot summarize the evidence in the record and demonstrate that there is no substantial evidence supporting the trial court's factual findings, because he does not know what they were. Nor can he address the trial court's reasoning on principal disputed issues and allow this court to "determine whether or not the trial court's decision is supported by the facts and the law.' [Citation.]" (*Marriage of Starr, supra,* 189 Cal.App.4th at p. 287.)

Cohen is effectively precluded from demonstrating a reasonable probability he would have obtained a better outcome in the absence of the trial court's error. (*Fisher, supra,* 25 Cal.App.5th at p. 20; see also *Wallis v. PHL* (2013) 220 Cal.App.4th 814, 825 (*Wallis*) ["trial court's failure to issue a statement of decision can have a significant adverse effect on that party's ability both to assess whether an appeal is justified and, if an appeal is filed, to present an effective challenge to the trial court's decision"].)

As Cohen argues on appeal, "[t]he trial court failed to answer questions as basic as what misrepresentations Dr. Cohen made, as well as the basis for concluding Dr. Cohen lacked reasonable grounds for believing any alleged misrepresentations were untrue, that Plaintiffs (through their agent Moshe Alafi) in fact did not know the allegedly omitted facts, that any alleged omissions were material, that Plaintiffs justifiably relied on any alleged omissions, or that any alleged omissions caused Plaintiffs' harm."

Indeed, the parties argue at length on appeal about whether the trial court found that Cohen made affirmative misrepresentations, omissions of material fact, or "half-truths," and the differing legal standards that may apply to those categories. Without

28

knowing what the trial court's findings were, this court cannot meaningfully resolve those arguments.

### 3. Remedy

Where a reviewing court determines that a trial court's failure to issue a properly requested statement of decision was prejudicial, the usual remedy is to remand with instructions to issue a proper statement of decision. (*Karlsen v. Superior Court* (2006) 139 Cal.App.4th 1526, 1531 (*Karlsen*) ["matter is remanded to the trial judge who originally presided over the trial to complete the process"]; see also *Marriage of S., supra,* 171 Cal.App.3d 738, 751 [reversing and remanding to the trial court "with directions for it to prepare a statement of decision in accordance with the views expressed herein"].)

In some circumstances, though, such as where there are additional reasons to reverse the judgment, remanding solely to prepare a statement of decision would be "an idle act." (*Espinoza v. Calva* (2008) 169 Cal.App.4th 1393, 1398.)

Cohen argues that those circumstances are present here, so this court should address his arguments on the merits and reverse on that basis as well. He contends that "[m]erely remanding to the trial court without consideration of the substantive legal errors precluding Dr. Cohen's liability for negligent misrepresentation would be needlessly inefficient and only lead to more cost and delay for an 88-year-old man who has been forced to pay over $29 million to Plaintiffs for what was at most an unintentional omission."

We decline to reach Cohen's arguments regarding the alleged substantive legal errors for the same reason we determine that the trial court's error was prejudicial: the trial court did not specify the facts and grounds upon which the judgment rests with respect to the principal controverted issues. As Cohen himself argues, the trial court failed to specify what misrepresentations he made, whether he lacked reasonable grounds

for believing any misrepresentations were untrue, or whether plaintiffs justifiably relied on any alleged misrepresentations or omissions.

Even if we could construe the trial court's judgment as having specified those facts and grounds, it would not alter the result here. For instance, paragraph three of the trial court's order states: "Plaintiffs knew that the lead compound identified by Defendants had previously been approved by the FDA for the treatment of skin ailments. Plaintiffs knew the compound had some level of toxicity to patients and that FDA approval for Nuredis was not guaranteed. At trial, Plaintiffs claimed they did not know that this lead compound had been withdrawn from the market by the FDA in 1976, due to potentially deadly side effects, and placed on the FDA's 'DO NOT COMPOUND' list, where it remains. It is undisputed that Defendants did know about the history of the compound and shared that information specifically and in written form with others prior to Plaintiffs' investment."

Arguably, the trial court's direct reference to Cohen's failure to disclose the FDA's withdrawal of HD106 from the market could signal that it based its ruling on that particular misrepresentation. However, the trial court still did not address and resolve the other principal controverted issues discussed above. Nor did it address plaintiffs' other causes of action for fraudulent inducement, fraudulent concealment, securities fraud, unfair competition, breach of fiduciary duty, and reformation. Thus, even if we were to construe the judgment in this manner and determine that substantial evidence does not support the trial court's findings, it would not resolve the case, and would still necessitate issuance of a statement of decision to address the other issues and, potentially, the other causes of action.

In short, we do not know what the trial court's findings in its statement of decision will be. It makes no sense to evaluate the substantial evidence challenges Cohen brings to the findings in the judgment, when a new and different judgment may be entered. (See, e.g., *In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 646–647 [court is not

30

bound by its statement of intended decision and may enter a wholly different judgment than that announced; statement of decision allows the trial court to review its memorandum of intended decision and make corrections, additions or deletions it deems necessary or appropriate].)

Thus, one of Cohen's additional arguments fails for the same reason. He contends that the evidence admitted at trial establishes, as a matter of law, that plaintiffs did not justifiably rely on Cohen's alleged misrepresentations, thereby defeating the negligent misrepresentation cause of action, rendering issuance of a statement of decision unnecessary, and compelling judgment in his favor. We briefly summarize the evidence Cohen cites in support of this argument.

First, he cites a "slide deck" he e-mailed to the Alafis in December 2015, in which he noted that "the search for drugs with 'acceptable toxicity' was 'IN PROCESS' and that 'Clinical Efficacy' had 'YET TO BE SHOWN.' "

Second, he cites a " 'Business Strategy' " memorandum he provided to the Alafis in April 2016, which stated: "*Extensive pharmacokinetic and toxicity data are available for HD106, which previously has been tested in humans for an application unrelated to NR diseases. … Toxicity is sub-optimal, but may be acceptable for treatment of NR diseases. It has not been determined whether beneficial effects occur in [neurological] diseases patients at drug levels that are known to yield acceptable toxicity.*"

Third, he cites two draft timelines he sent the Alafis in February and April 2016, which he claims "expressly showed that the FDA might require additional preclinical toxicology studies on HD106 by projecting the performance of such studies over multiple quarters before the start of clinical trials." According to Cohen, this evidence—which he claims was "cautionary as to the drug's safety and projected the potential for additional preclinical studies"—shows that plaintiffs knew about HD106's FDA history and toxicity risks before investing in Nuredis.

31

Fourth, Cohen points to the stock purchase agreement, in which he claims the Alafis acknowledged having not requested any written disclosure of risks. The relevant section of the stock purchase agreement provides: "The Company has made available to the Purchasers all the information reasonably available to the Company that the Purchasers have requested for deciding whether to acquire the Shares. No representation or warranty of the Company contained in this Agreement and no certificate furnished or to be furnished to Purchasers at the Closing contains any untrue statement of a material fact or, to the Company's knowledge, omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. It is understood that this representation is qualified by the fact that the Company has not delivered to the Purchasers, and has not been requested to deliver, a private placement or similar memorandum or any written disclosure of the types of information customarily furnished to purchasers of securities."

We do not agree that this evidence establishes, as a matter of law, that plaintiffs could not prevail on their negligent misrepresentation cause of action. As a threshold matter, the evidence was not undisputed. Plaintiffs argued, for instance, that the slide deck information Cohen sent them omitted any reference to withdrawal of FDA approval for HD106. Indeed, one of plaintiffs' central arguments is that, while Cohen disclosed some concerns about HD106's toxicity, he did not disclose that the drug had been withdrawn from the market: "It was misleading for Cohen to represent that toxicity was 'sub-optimal' but safe enough for FDA to approve HD106 to go on the market to treat a skin rash when he knew, but failed to disclose, that FDA had quickly withdrawn that approval due to the drug's deadly side effects." Plaintiffs also dispute Cohen's characterization of the stock purchase agreement, arguing that the cited provision does not "immunize[] him from liability for engaging in misleading half-truths in his prior communications to induce the investment," and that "any such provision would be unenforceable as a matter of law."

32

More importantly, though, as we have explained, the trial court did not resolve the other principal controverted issues. Plaintiffs identified numerous alleged misrepresentations and omissions in their post-trial brief, including: the pharmacokinetic properties of HD106 and its ability to penetrate the blood brain barrier and accumulate significantly in the brain; the failure to disclose pre-investment interactions with a non-profit Huntington's disease organization; and the validity of the purported target protein and its ability to generate a selective reduction in the mutant Huntingtin protein.

In other words, even if Cohen were correct that plaintiffs could not have justifiably relied on his failure to disclose the risks of toxicity and the drug approval timeline, the trial court did not resolve the other issues and we do not know what findings it will make regarding the other alleged misrepresentations on which plaintiffs may have justifiably relied, or regarding the other causes of action.

Accordingly, we will remand the matter "to the trial judge who originally presided over the trial to complete the process." (*Karlsen, supra,* 139 Cal.App.4th at p. 1531 ["If the trial judge who originally presided over the trial has become *incapacitated* or has died, no other judge can perform the task and the matter must be retried."]; see also, *Wallis, supra,* 220 Cal.App.4th 814, 827 [where judge who heard the case is unavailable, "only appropriate appellate remedy" was to remand for new trial].)

## III.   DISPOSITION

The judgment is reversed and the matter is remanded with directions to the trial court to prepare the requested statement of decision and for other proceedings consistent with this opinion. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278 (a)(5).)

_____

                                    Wilson, J.


WE CONCUR:


_____

         Bamattre-Manoukian, Acting P. J.


_____

                  Danner, J.


Alafi et al. v. Cohen
H050485

Trial Court:                                  Santa Clara County
                                              Superior Court No.:  18CV333075



Trial Judge:   The Honorable Beth A.R. McGowen



Attorneys for Plaintiffs and Respondents      Geoffrey Alan Friedman
Christopher D. Alafi et al.:                  Laurence Schoen




Attorney for Defendant and Appellant          Robert P. Feldman
Stanley N. Cohen:                             David Eiseman




Alafi et al. v. Cohen
H050485